School District of Philadelphia *v.* Zoning Board of Adjustment, Appellant.

Argued January 12, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Levy Anderson,* First Deputy City Solicitor, with him *Gerald Gornish* and *Carl K. Zucker,* Assistant City Solicitors, *Matthew W. Bullock, Jr.,* Deputy City Solicitor, and *Edward G. Bauer, Jr.,* City Solicitor, for appellant.

*Joseph W. Marshall,* for school district, appellee.

OPINION BY MR. JUSTICE EAGEN, March 16, 1965:

This is an appeal by the City of Philadelphia from an order of the Court of Common Pleas No. 4 of Philadelphia County overruling the decision of the zoning board of adjustment (Board) and holding that the School District of Philadelphia (School District) is exempt from the zoning provisions of the City of Philadelphia Code of Ordinances.

This case brings into sharp contrast the conflicting assertions of authority by two coterminous municipal bodies within the boundaries of the City of Philadelphia, and thus poses the question: Does the City of Philadelphia, under its Home Rule Charter[1] and the Zoning Enabling Act,[2] have the power to regulate by means of zoning ordinances the construction of public school buildings by the School District within the city limits?

The facts are these:

There presently exists on the southerly side of W. Thompson Street, between N. 26th Street and N. Taney Street, a public school known as the Robert Morris Public School. Because of an increase in population, the existing building is inadequate to meet the needs in the area. Therefore, the School District proposes to raze this structure and replace it with a new and larger plant to accommodate a greater number of pupils.

---

[1] Adopted pursuant to the First Class City Home Rule Act of April 21, 1949, P. L. 665, §1 et seq., 53 P.S. §13101 et seq.

[2] Act of May 6, 1929, P. L. 1551, §1 et seq., 53 P.S. §14752 et seq.

In order to accomplish this, the city vacated a public street immediately to the south of the present school property and, in addition, the School District acquired further property beyond this vacated street bed through its power of eminent domain. Thus, the School District has extended the assembled property in a southerly direction to the property line of another upon which is located a large structure, the acquisition of which is apparently beyond the present financial power of the School District.

The prevailing zoning requirements for a structure in this district include, inter alia, a maximum height of 35 feet, a rear yard depth of 9 feet and provisions for an off-street parking area which affords one parking space for each 1000 square feet of gross floor area of the building. In contravention of these requirements, the proposed structure is to be 50 feet in height, with no rear yard, and would provide no off-street parking area in spite of the fact that the gross floor area is 90,000 square feet.

The School District applied to the Department of Licenses and Inspections for a permit to construct the school plant, which was denied because of the above failures to comply with the zoning provisions, and also because a school was not a permitted use within the districts wherein the property was located.

Thereupon, the School District appealed to the Board for zoning variances and for a certificate of exception, all of which were refused after public hearing. The Board did find that a school building was a permitted use, but based its refusal on the ground that the proposed building would violate the other zoning criteria sought to be avoided, and that such violations would "substantially increase congestion in the public streets" and would be against the overall public interest and not in harmony with the spirit and purpose of the zoning ordinance.

The School District appealed to the Court of Common Pleas of Philadelphia County which reversed the decision of the Board solely upon the basis and conclusion that the School District is exempt from all provisions of the City's code of ordinances relating to zoning. We granted certiorari.

As a result of concession at oral argument before this Court, it was stipulated that the Board would not continue to impose limitations upon the height of the proposed building and the depth of the rear yard appurtenant thereto. Thus, the sole area of dispute now is whether the Board is empowered to require the School District to comply with the zoning regulation concerning off-street parking. The restricted area of the present dispute does not change the nature of the basic question for decision. The issue still remains: does the City of Philadelphia have the power to enforce zoning regulations of any nature against the School District. If the power of the City to enact and enforce zoning regulations is statutorily limited in that school districts are exempt, or if the legislature has granted complete and plenary power to the School District over its physical plants, or even if it has reserved this power unto itself, then the City is without authority to enforce the regulation here involved. We emphasize that the question as to whether or not the Board abused its discretion in refusing to grant a zoning variance is not presently before us.

Hence, the issue is one of pure power in the City. Since the City is a municipal corporation created by the state, it possesses only those powers specifically granted by the legislature: *Schultz v. Philadelphia,* 385 Pa. 79, 122 A. 2d 279 (1956), and *Genkinger v. New Castle,* 368 Pa. 547, 84 A. 2d 303 (1951). Zoning laws, enacted in the exercise of the police power, are likewise governed by specific statutory grant. See, *Kline v. Harrisburg,* 362 Pa. 438, 68 A. 2d 182 (1949).

The City of Philadelphia was initially empowered to enact zoning legislation by ordinance by the Zoning Enabling Act, supra note 2, 53 P.S. §14752. By virtue of the authority granted therein, the City passed its basic zoning ordinance in 1933. In 1949, pursuant to Article XV, §1 of the Constitution of Pennsylvania, the General Assembly passed the First Class City Home Rule Act, supra note 1, 53 P.S. §13101 et seq., giving cities of the first class taking advantage of the act, subject to certain limitations, all powers and authority of local self-government, together with complete powers of legislation and administration relative to its municipal functions. The City of Philadelphia, pursuant to the Act of 1949, supra, adopted a Home Rule Charter on April 17, 1951, effective January 7, 1952. It was, therefore, empowered to legislate as to municipal functions, subject to certain limitations which will be discussed later, as fully as could the General Assembly. Kelly v. Philadelphia, 382 Pa. 459, 115 A. 2d 238 (1955), and Warren v. Philadelphia, 382 Pa. 380, 115 A. 2d 218 (1955).[3]

The present zoning code of the City was adopted July 31, 1962, effective October 1, 1962, and represents a recodification of the zoning ordinances previously enacted.

As noted before, the City's power to legislate is not absolute, and its charter is subject to such restrictions,

---

[3] Section 17 of the First Class City Home Rule Act, supra, 53 P.S. §13131, provides, in pertinent part, as follows: "The charter of any city adopted or amended in accordance with this act may provide . . . for the exercise of *any and all powers* relating to its municipal functions, not inconsistent with the Constitution of the United States or of this Commonwealth, *to the full extent that the General Assembly may legislate in reference thereto . . ., and with like effect, and the city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law.*" (Emphasis supplied).

limitations and regulations as the legislature may conclude to impose. See, *Cali v. Philadelphia*, 406 Pa. 290, 177 A. 2d 824 (1962). These restrictions and limitations have been specifically set forth in §18 of the Act of 1949, 53 P.S. §13133. It is to the construction of these restrictive provisions that we must primarily direct our attention.

Section 18 provides, inter alia: ". . . [N]o city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are—(a) Applicable to a class or classes of cities on the following subjects: . . . (6) Regulating public schools; . . . (b) Applicable in every part of the Commonwealth."

The School District maintains that the limitations enumerated in §18 clearly manifest that the legislature did not intend the City to interfere with the construction of public school buildings. It urges that such a function is an integral part of the educational system, the sole administration of which is vested in the School District, and that to permit the City to interfere therewith constitutes "Regulating public schools", and is an exercise of power contrary to and in limitation of powers granted by other acts of the General Assembly which are applicable in every other part of the Commonwealth in regard thereto. We cannot subscribe to this position.

In the first place, we do not consider the imposition of a zoning regulation, enacted for the protection of the health, safety and general welfare of the community, requiring off-street parking to avoid traffic congestion to be regulation of public schools. Such a zoning regulation is of a distinctly different nature. As we view the term "Regulating public schools", this deals more with the quality of public education than with the physical structures required to provide it. "The building of school buildings is but a necessary

incident to the fulfillment of the primary duty of educating the young": *Port Arthur Independent School District v. City of Groves*, 376 S.W. 2d 330, 334 (Tex. 1964). Moreover, zoning is peculiarly a local matter and the prohibition imposed on the City by the Act of 1949 against the exercise of powers contrary to, or in limitation of, other acts of the General Assembly applies only to substantive matters of state-wide concern. See, *Bartle v. Zoning Board of Adjustment*, 10 Pa. D. & C. 2d 613 (1957), aff'd 391 Pa. 207, 137 A. 2d 239 (1958). We regard state-wide interest, and thus the area protected from local interference by statute, to be centered in, for example, the number of hours that children must attend school and the types and emphasis of courses that shall be presented to them. We see no inherent state-wide interest in the fact that certain school buildings, because of local problems of congestion, should be so situated that space is available for off-street parking, or even that, because of overcrowded conditions, each building should be of only a certain height, or that it should have a back yard of a certain depth. These are areas which the legislature did not intend to protect when it denied to cities the power to regulate public schools. In requiring off-street parking facilities, the City here is not "Regulating public schools"; it is merely trying to enforce methods of combating the congestion of its public streets by means which it considers reasonably calculated to accomplish this result. That there is some additional cost to the educational system does not mean ipso facto that there is regulation of schools. Should the cost become so unreasonably oppressive as to prevent the fulfillment of the duty of providing public schools, then the remedy of variance is available. But, as yet, the record contains no indication that the requirement of such facilities would be in effect a prohibition of the building. The record shows

only that the area next appurtenant southerly cannot be acquired. There is no indication that other property could not be acquired for parking facilities which is within the School District's financial ability. Until the City's regulation of school building construction assumes the proportions of financial prohibition, then the City is not regulating public schools by this type of ordinance.

It must be pointed out in this context that the School District has emphasized the fact that they expanded southward upon this city block to the full extent of their present financial ability, pointing out that it would cost "a heck of a lot of money to get" the structure next appurtenant to the presently assembled lot. However, there is no city requirement that the parking facility be contiguous to the school building, or even that it be on the same block. Of course, we realize that it would defeat the whole purpose of the facility if it were located so remotely that the employees would not use it. But there remains some latitude in choosing the site.

In arriving at the above conclusions, we are not unmindful of the fact that the Public School Code, Act of March 10, 1949, P. L. 30, §§701 & 702, 24 P.S. §§7-701 & 7-702, places in the School District the duty of providing the grounds and buildings necessary to the performance of administering the Commonwealth's system of public education, and the discretion of determining the location and size of the real estate for this specific purpose. However, we do not consider the imposition of a zoning regulation as here involved to amount to an interference with these vested responsibilities, nor do we interpret these specific provisions of the Code to preclude the City from imposing a duty to acquire additional land in connection with a proposed site when such is necessary for the protection of the health, safety and welfare of the com-

munity. And this is exactly what the zoning regulation involved purports to do.

We are not persuaded that the legislature has, by its statutory pronouncements, given a school district of the first class complete and plenary power over its physical plants. In fact, the opposite is indicated.

Article X, §1 of the Constitution of Pennsylvania provides, in part, that "the General Assembly shall provide for the maintenance and support of a thorough and efficient system of public schools . . . ."

The legislature has chosen to carry out this function through local school districts with varying degrees of power, depending upon classification. While the school districts, in discharging this educational function, enjoy some of the attributes of the sovereignty of the Commonwealth, they are independent bodies with limited powers which are set forth in the Public School Code, Act of 1949, supra, 24 P.S. §1-101 et seq. They do not enjoy the police power of the state.

The Code contains certain *minimal* regulations which are applicable to all schools throughout the Commonwealth.[4] But standarized approval of construction plans by the Department of Public Instruction or the State Council of Education is specifically limited to school buildings in districts of the second, third and fourth classes: 24 P.S. §§7-731, 7-733 and 7-734.[5]

---

[4] See note 10, infra.

[5] In school districts of the first class prior approval of construction plans by the superintendent of buildings is required: 24 P.S. §21-2111. However, the superintendent of buildings is an official appointed by the local school board: 24 P.S. §21-2104. Furthermore, the local school board is also an appointed body: 24 P.S. §3-302. Therefore, construction approval is left in the hands of an appointee of appointees. In pointing this out, we do not mean to say that the administering officials are incapable or lax in the performance of their duties; but we do not think that the legislature intended to leave sole discretion to approve construction plans in an

Further, the Act of April 27, 1927, P. L. 465, §1 et seq., as amended, 35 P.S. §1221 et seq.,[6] which provides for safety and health regulations for certain buildings within the Commonwealth, including schools, 35 P.S. §1228 states: "It shall be the duty of the owner . . . to submit to the Department of Labor and Industry for approval . . . data showing compliance with the provisions of this act . . . . No such building or structure shall be erected . . . until such plans have been examined and approval given . . ., and *a building permit obtained in municipalities where such permit is required by ordinance.*"[7]

Thus we see that, at least in regard to the safety and health of persons assembled in a school building, the legislature has provided explicitly for the setting of minimum standards by the Department of Labor and Industry, and further by implication has provided, in appreciation of particular local problems, that more stringent standards might be set by local municipalities. This implication is strengthened by §12 of the Act of May 6, 1929, P. L. 1551, 53 P.S. §14762, which provides in regard to zoning (a matter of regulation for, inter alia, the safety and health of the public) in cities of the first class: "Wherever the regulations made under authority of this act require a greater width or size of yards . . . or require a lower height of building . . . or impose other higher standards than are required in *any other statute or local ordinance or regulations,* the provisions of the regulations made under authority of this act shall govern."

A reading of these provisions shows the obvious intent of the legislature to provide fully for the safety and health of the Commonwealth's citizenry. It wise-

office such as this without regard to workable standards predetermined to be adequate for the protection of the general welfare.

[6] Which we conclude is still in force as to cities of the first class: Cf. *Kelly v. Philadelphia,* supra.

[7] Emphasis supplied throughout, unless otherwise noted.

ly recognized that the congestion and other peculiarly local problems in cities of the magnitude of cities of the first class could and often do permit of and require more stringent regulation for the protection of the general welfare.

The School District contends that the legislature has not set standards to which the local zoning ordinances must conform, and that, therefore, there is no assurance that the City's standards will be any more conducive to the promotion of the general welfare than will those of the superintendent of buildings. However, merely because the City sets certain minimum standards for building construction does not mean that the school directors must gravitate to this lowest point. There is no prohibition against the setting of standards higher than those required by the City on the part of the superintendent of buildings. What was said by the Supreme Court of Texas in *Port Arthur Independent School District v. City of Groves,* supra, 376 S.W. 2d at 334, is particularly appropriate: "The city, in performing its duties as delegated to it by the state, does not usurp the authority and responsibility of the school district in the realm of education by requiring the school buildings to meet certain minimum standards of construction any more than it usurps the control and management of individuals and private corporations over their property and affairs by making them meet those same standards.

"To hold otherwise would be to leave a hiatus in regulation necessary to the health and safety of the community. The state has not provided a system of regulation and inspection of school buildings under construction by local school districts as has the State of California.[8]   If the city cannot require certain

---

8 Nor has the Commonwealth of Pennsylvania in regard to school districts of the first class.

standards, there could be only the school district itself to determine such standards. The schools could be built so as to be inconsistent with the city's scheme of regulation and inconsiderate of the city's peculiar problems of health and safety."

Finally, while the legislature could without question have (and may still by future action) reserved the entire control of every matter regarding public schools to itself, in large measure this has not been done, nor has a pre-emption of the field arisen, as to the construction of school buildings in cities of the first class. California met this problem in the parallel cases of *Pasadena School District v. City of Pasadena*, 134 Pac. 985 (Cal. 1913), and *Hall v. City of Taft*, 302 P. 2d 574 (Cal. 1956).

The *Pasadena* case, while recognizing that the local school officials had the power to locate, plan and construct school buildings, declared that there was an overriding interest in the municipality to protect the school children, and that local standards must be met to assure such a result. It was stated therein, 134 Pac. at 986, that "the state undoubtedly might provide . . . for a complete system of regulation for the protection of the public health, safety and comfort in the erection of school buildings. But this it has not done."

Apparently heeding this advice, the legislature acted, prior to the decision in *Hall v. City of Taft*, supra, wherein it was held that the state had occupied the field by enacting a comprehensive education code, including a provision for standardized approval of construction plans for all school buildings within the state.[9]

---

[9] West's Ann. Education Code §18194 provides: "The Division of Architecture shall pass upon and approve or reject *all plans* for the construction or alteration of, or addition to, *any school building.*"

While this was an alternative holding in *Hall,* it leaves no doubt that the scheme there established is far more comprehensive than the present Commonwealth system, and that the Commonwealth of Pennsylvania has not pre-empted the field of school building construction by first class school districts in cities of the first class. No system of regulation and inspection has been established; and we do not read legislative inaction in a field so intimately intertwined with the safety and health of the children of this Commonwealth as is the regulation of school building construction to be a declaration of policy to the effect that school directors (appointed officials) in districts of the first class shall be allowed a free hand to construct without regard to predetermined standards promulgated to protect the children over whom they have responsibility. This is especially true when we note that when the legislature desired to establish a fixed standard on its own initiative it did so by express terms.[10]

We feel constrained to state at this point that the question of whether or not the City can prevent the erection of a school building in any particular zoning district has not been raised on this appeal for the reason that the Board found as a matter of fact that a school was a permitted use in the districts here involved. We therefore find it unnecessary to determine whether the Commonwealth has an overriding

---

[10] Public School Code of 1949, Act of March 10, 1949, P. L. 30, §1 et seq., 24 P.S. §7-738—requiring all school buildings in districts of the first class of *2 or more* stories to be of fireproof construction, but requiring such in all other districts only in buildings of *more than 2* stories. (Surely some inference can be drawn that the legislature recognized the added danger in congested areas); cf. 24 P.S. §§7-736, 7-737, and 7-739—requiring buildings in *all* districts to have no unshielded heating stoves, to have proper ventilation, etc., and to have fire escapes and doors that open outward, etc.

interest in the fact of existence, as opposed to the manner of construction, of school buildings in the City of Philadelphia. We would consider it highly doubtful, however, that the City could "zone-out" schools entirely, or could limit the statutory grant of discretion applicable to all school directors within the Commonwealth to choose the location of school grounds (24 P.S. §7-702).

We therefore find that the City of Philadelphia has been empowered to prescribe reasonable ordinances for the protection of safety, health and the general welfare, which, in regard to municipal functions, shall have the force of legislative enactment. We further find, in view of the School District's lack of police power, the failure of the legislature to provide minimum standards, and the lack of state pre-emption in this field, that the School District is not immune from such ordinances and that it must comply therewith.

The order of the court below is reversed and the record is remanded for a hearing to determine whether the Board abused its discretion in refusing to issue a zoning variance.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:
I dissent.

Notwithstanding the fact that the majority does not expressly decide the question, the implication and the necessary result of the majority Opinion is to enable the City to practically and effectually prohibit the erection of adequate school buildings within zoned areas or districts, in which the School Board desires and the City opposes a school.