858 A.2d 75

The CITY OF PHILADELPHIA and John F. Street, Appellants,

v.

Mark SCHWEIKER; the Philadelphia Parking Authority; Joseph T. Ashdale; Michael A. Cibik; Catherine Marshall; Alfred W. Taubenberger; Russell R. Wagner; Karen M. Wrigley, Appellees.

Supreme Court of Pennsylvania.

Argued May 12, 2004.

Decided Sept. 22, 2004.

594

Richard Gerson Feder, Esq., Pedro Alberto Ramos, Esq., Eleanor N. Ewing, Esq., Philadelphia, for City of Philadelphia.

Eleanor N. Ewing, Esq., Philadelphia, for John F. Street.

Carolyn H. Nichols, Esq., Dennis Gerard Weldon, Jr., Esq., Obra S. Kernodle, Esq., for Philadelphia Parking Authority.

G. Alexander Bochetto, Esq., for Michael A. Cibik.

Gregg R. Melinson, Esq., Jason Peter Gosselin, Esq., Alfred W. Putnam, Esq., David P. Bruton, Esq., Philadelphia, for Philadelphia Parking Authority, et al.

Susan Jane Forney, Esq., Harrisburg, for Honorable Edward G. Rendell.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice SAYLOR.

This is a direct appeal from an order of the Commonwealth Court sustaining the preliminary objections of the Governor of Pennsylvania and the Philadelphia Parking Authority to a complaint filed by the City of Philadelphia and its mayor, challenging the legality of certain amendments to Pennsylvania's Parking Authority Law. The principal question presented is whether the General Assembly had the authority to enact provisions which, among other things, transferred control of the parking authority from the Mayor of Philadelphia to the. Commonwealth.

## I.

As early as 1947, the post-War pattern of suburban growth, combined with large numbers of individuals commuting via private automobile to workplaces inside cities, had generated the need for an increase in the availability of off-street parking in urban areas throughout the Commonwealth. The Legislature, aware of this problem, considered it a matter of statewide concern, finding that it impacted upon persons residing both inside and outside of the affected cities.[1] Thus, the General Assembly enacted the Parking Authority Law,[2] enabling cities, boroughs, and first class townships to create parking authorities in order to provide, administer, and collect revenue from, various types of parking facilities. *See generally* 53 P.S. § 344 (relating to method of incorporation) (recodified as amended at 53 Pa.C.S. § 5504). Although the statute constituted an enabling act authorizing the specified municipalities to create such authorities by ordinance or resolution, it provided that any parking authority thus created would not be considered a municipal instrumentality, but would instead constitute a "public body corporate and politic, exercising public powers of the Commonwealth as an agency thereof." 53 P.S. § 345 (relating to purposes and powers) (recodified as

1. The Legislature's declaration of policy reflects its findings, *inter alia:*
 (b) That the free circulation of traffic of all kinds through the streets of cities of the first, second, second A and third classes, boroughs, and townships of the first class is necessary to the health, safety and general welfare of the public whether residing in the [affected city or township], or traveling to, through or from [it];
 (c) That the greatly increased use by the public of motor vehicles of all kinds has caused serious traffic congestion on the streets of [these municipalities];
 (d) That the parking or standing of motor vehicles of all kinds on the streets has contributed to this congestion to such an extent as to interfere seriously with the primary use of such streets for the movement of traffic; [and]
 (e) That such parking or standing prevents the free circulation of traffic in, through, and from [such municipalities], impedes rapid and effective fighting of fires and the disposition of police forces . . . and endangers the health, safety and welfare of the general public[.]
 53 P.S. § 342 (recodified as amended at 53 Pa.C.S. § 5502).

2. Act of June 5, 1947, P.L. 458 (as amended, 53 P.S. §§ 341–356) (repealed and recodified as amended at 53 Pa.C.S. §§ 5501–5517).

amended at 53 Pa.C.S. § 5505). Several benefits flowed from this designation, including that parking authorities could finance construction projects free from the debt limits applicable to local governments, *see* PA. CONST. art. IX, §§ 10, 12; 53 Pa.C.S. §§ 8001–8285, and that, like other authorities, they could engage in proprietary or business-type operations from which local governments might otherwise be precluded. *See generally SEPTA v. Union Switch & Signal,* 161 Pa.Cmwlth. 400, 404, 637 A.2d 662, 664–65 (1994).

The facts underlying the present dispute are as follows.[3] The Philadelphia Parking Authority (the "Parking Authority") was created in 1950 by ordinance of the City of Philadelphia (the "City"), which was adopted pursuant to the Parking Authority Law. In 1987, the City extended the life of the Parking Authority to 2037, making its life span coterminous with that of several outstanding bond issues. Initially, the Parking Authority only operated certain off-street parking garages. These operations continue to the present, and are generally carried out through leases with the City. In particular, the City leases to the Parking Authority the land and/or buildings necessary for the latter to operate parking garages and surface lots within the City and at the Philadelphia International Airport (the "Airport") on land owned by the City. In return, the Parking Authority pays to the City rent derived from the revenues received from these parking operations. This rent has amounted to approximately $21,500,000 per year for the past several years; the vast majority of this money has come from the parking facilities located at the

3. As this is an appeal from the sustaining of preliminary objections, we must accept as true all well-pled material facts set forth in the complaint, *see Graham v. Today's Spirit,* 503 Pa. 52, 55 n. 1, 468 A.2d 454, 456 n. 1 (1983), and affirm the order only if the plaintiffs are not entitled to relief based upon those facts together with all inferences fairly deducible from them. *See Small v. Horn,* 554 Pa. 600, 608, 722 A.2d 664, 668 (1998). Although much of the background has previously been summarized, *see City of Phila. v. Philadelphia Parking Auth.,* 568 Pa. 430, 441, 798 A.2d 161, 168 (2002) (concurring statement of Saylor, J.); *id.* at 449–52, 798 A.2d at 173–75 (dissenting statement of Zappala, C.J.); *City of Phila. v. Philadelphia Parking Auth.,* 837 A.2d 1267, 1268–69 (Pa.Cmwlth.2003), it is nonetheless useful to review the material facts and procedural history relevant to this appeal.

Airport's terminals, which were built on land owned by the City and financed primarily through bond issues. Because the federal government provided the City with grants to operate the Airport, the City may be required to segregate the monies received from the airport parking facilities into a fund designated for Airport use. *See* 49 U.S.C. § 47107(b).

As amended in 1982, the Parking Authority Law authorized cities to delegate to their parking authorities responsibility for certain on-street parking functions, some of which are revenue-producing (e.g., issuing parking tickets and collecting money from parking meters). Such revenues from on-street functions were required by statute to be distributed back to the municipality as provided by ordinance or resolution. Thus, in 1983, the City passed an ordinance giving the Parking Authority responsibility for much of the City's on-street parking services, which had previously been handled by multiple departments of the City.[4] In keeping with the provisions of the ordinance, these responsibilities are fulfilled under an intergovernmental cooperation agreement. From such activities, the Parking Authority collected net revenues of approximately $13,000,000 per year during the past several years. These monies formed a part of the City's operating budget and were accordingly reported in the City's five-year plan as revenue to balance the City's budget.

Throughout its existence, the Parking Authority has issued numerous tax-exempt long-term municipal bonds (some of which are still outstanding) to finance parking-related development projects within the City and at the Airport. Some of these bond issues subsume parking service contracts between the City and the Parking Authority which require the City to guarantee the debt servicing of the bonds in the event that the Parking Authority defaults. At the time these contracts were

---

4. These activities—which include installing and maintaining parking meters, promulgating on-street parking regulations, installing signage, issuing parking permits, collecting parking meter receipts and fines, issuing parking tickets, and booting and towing illegally parked vehicles—had previously been carried out separately by, *inter alia*, the City's Streets Department, Police Department, Department of Licenses and Inspection, and Revenue Department.

executed, the Parking Authority Law effectively placed the City in a position to control some of the factors which affected its risk, including the composition of the Parking Authority's governing board.

Pursuant to Section 8 of the Parking Authority Law, 43 P.S. § 348 (superseded), the Parking Authority was, until recently, controlled by a five-member governing board appointed by the Mayor of Philadelphia (the "Mayor"). On June 19, 2001, however, then-Governor Ridge signed into law Act 22 of 2001 ("Act 22").[5] Act 22, *inter alia*, codified the Parking Authority Law at Sections 5501 through 5517 of Title 53 of the Pennsylvania Consolidated Statutes, 53 Pa.C.S. §§ 5501–5517, *see generally City of Phila. v. Commonwealth*, 575 Pa. 542, 582–84 & n. 21, 838 A.2d 566, 590–92 & n. 21 (2003) (explaining the process of statutory codification), and amended the Parking Authority Law by adding a special provision—applicable only to Philadelphia—supplanting the Mayor's appointment powers over the Parking Authority's governing board and repositing appointment authority in the Governor.[6] This provision additionally required the reconstituted Parking Authority to transfer up to $45,000,000 of its retained earnings to the Philadelphia School District, with similar subsequent annual transfers based upon the availability of earnings. Specifically, the Parking Authority Law states:

> During its fiscal year beginning in 2001, the authority shall transfer to the general fund of a school district of the first

5. Act of June 19, 2001, P.L. 287, No. 22.

6. The original members of the board appointed by the Mayor continue to serve out their terms, but no new members may be appointed by the Mayor. Meanwhile, the number of board members is immediately increased to eleven, with the six new members appointed by the Governor. All of the gubernatorial appointees must be residents of the City; two are appointed upon the Governor's own discretion, two are selected by the Governor from a list prepared by the President *pro tempore* of the Senate, and two are similarly selected from a list prepared by the Speaker of the House. *See* 53 Pa.C.S. § 5508.1(d-f). The five original positions are then phased out as the mayoral appointees' terms expire, and the board is ultimately left with the six gubernatorial appointees. *See* 53 Pa.C.S. § 5508.1(a-j). Thus, although the transfer occurs in stages, the Governor is given immediate appointment authority over a majority of board positions.

class coterminous with the parent municipality that portion of its retained earnings, not to exceed $45,000,000, which will not jeopardize the authority's ability to meet debt service payments or to retire outstanding bonds. In subsequent years the board shall transfer the maximum amount it deems available for such purpose.

53 Pa.C.S. § 5508.1(q).

Consistent with these statutory amendments, the Governor added six members to the existing five-member board. The City thereafter filed a complaint in the Philadelphia County Court of Common Pleas, naming the new appointees as defendants and challenging the validity of the amendments. The City also sought injunctive relief to prevent the new board members from being sworn in. The common pleas court, however, concluded that the Governor was an indispensable party by virtue of his new appointment powers, and that it therefore lacked jurisdiction. Accordingly, by order dated July 10, 2001, the trial court transferred the case to the Commonwealth Court pursuant to Section 5103(a) of the Judicial Code. *See* 42 Pa.C.S. § 5103(a). After holding a hearing, the Commonwealth Court dismissed the matter for lack of jurisdiction,[7] prompting the City to seek an emergency stay and the exercise of King's Bench powers by this Court. Relief was denied to the extent that the City sought to prevent the seating of the newly-constituted board, although this Court did stay further implementation of the challenged amendments. *See City of Phila. v. Philadelphia Parking Auth.*, 566 Pa. 230, 780 A.2d 601 (2001) (*per curiam*). Thereafter, this Court vacated the Commonwealth Court's dismissal order, remanded the matter for consideration on the merits, and lifted its previous stay. *See City of Phila. v. Philadelphia Parking Auth.*, 568 Pa. 430, 798 A.2d 161 (2002) (*per curiam*).[8] The

7. The Commonwealth Court concluded that the Governor was not, in fact, an indispensable party, and moreover, that the Parking Authority was a local agency for jurisdictional purposes. Rather than re-transfer the case to the common pleas tribunal, however, the Commonwealth Court dismissed the complaint so that the parties could appeal the jurisdictional question to this Court.

8. The Commonwealth Court's dismissal order was summarily reversed by *per curiam* order, and hence, there was no majority holding setting

City then filed an amended complaint, adding Mayor Street as a plaintiff and then-Governor Schweiker as a defendant.

The amended complaint, filed by the City and Mayor Street (collectively, "Appellants"), includes nine counts, alleging that: the Act 22 amendments impermissibly and unconstitutionally infringe upon Philadelphia's home rule charter and corresponding ordinances;[9] the amendments violate a legislative pledge not to alter or limit any rights of the Parking Authority until all bonds have been fully met and discharged; the City relied on such pledge in its dealings with the Parking Authority, including the lending of its credit and the entering into of contracts; the singling out of the Parking Authority constitutes special legislation that carries no substantial, valid, or rational basis; the special or local amendments were passed without the constitutionally required published notice; the amendments unconstitutionally delegate municipal functions to a special commission; and the amendments were passed in a bill that addressed both municipal authorities and parking authorities, thus violating the Pennsylvania Constitution's single-subject rule. The Commonwealth and the Parking Authority (collectively, "Appellees") thereafter filed preliminary objections, contending that the City lacked standing, and asserting demurrers to all counts of the amended complaint.

An *en banc* panel of the Commonwealth Court granted Appellees' preliminary objections and dismissed the complaint. *See City of Phila. v. Schweiker*, 817 A.2d 1217 (Pa.Cmwlth. 2003). Addressing first the challenge to the City's standing, the court concluded that the City is a creature of the sovereign and thus, has no standing to assert the claims of its citizens against the Commonwealth. *See id.* at 1222 (citing *City of Pittsburgh v. Commonwealth*, 112 Pa.Cmwlth. 188, 535 A.2d 680 (1987), *aff'd*, 522 Pa. 20, 559 A.2d 513 (1989)). The court reasoned that the City neither described nor established

forth the basis for this Court's determination that original jurisdiction properly lay in the Commonwealth Court. *See id.*

**9.** Philadelphia adopted its home rule charter under the terms of the First Class City Home Rule Act on April 17, 1951; it went into effect on January 7, 1952. The charter is codified at 351 Pa.Code §§ 1.1–100–12.12–503.

a discernible adverse impact from the amendments, rejecting the allegation that the amendments constitute an "aggressive intrusion on local self-determination." *Id.* The court therefore removed the City from the case, leaving Mayor Street as the sole remaining plaintiff.

Turning to the merits of the individual counts, the Commonwealth Court indicated that the Home Rule doctrine—which allows for autonomous self-governance relative to municipal affairs—does not apply with respect to the Parking Authority, because the Parking Authority is not an agency of a municipal government, but rather, is an agent of the Commonwealth. *See id.* at 1223 (citing *Herriman v. Carducci,* 475 Pa. 359, 380 A.2d 761 (1977)). In addition, the court stated that Article 9, Section 2 of the Constitution specially provides that the powers and authority under home rule charters are expressly limited by acts of the General Assembly. *See id.* (citing *Ortiz v. Commonwealth,* 655 A.2d 194 (Pa.Cmwlth.1995), *aff'd* 545 Pa. 279, 681 A.2d 152 (1996)). As to the counts premised upon the alleged violation of the pledge previously given by the Legislature, the Commonwealth Court determined that such a legislatively conferred pledge does not create a contractual right, and that the General Assembly "unquestionably has the authority to review the Authority's method of appointment." In any event, the court concluded, appointment of Parking Authority members by the Governor does not impair the security of bondholders. *See id.*

Regarding the constitutional challenges, the Commonwealth Court first explained that there were no specific allegations as to how any of the City's contractual obligations were altered by the amendments, and moreover, there was no contention that the Mayor, the remaining plaintiff in the case, had entered into contracts with the Authority. The court also noted that the original legislation created no contractual right to the manner of selection of members of the Parking Authority's board. As to the special legislation claim, the Commonwealth Court observed that the Philadelphia School District is the only such entity in the Commonwealth that lacks the authority to directly levy taxes, and thus, the legislation bears

a reasonable relation to the purpose of ensuring adequate funding for the district. Addressing the claim that the amendments delegate municipal functions to a special commission, the Commonwealth Court explained that the Parking Authority is not a special commission, but is instead a "public body corporate and politic, exercising public powers of the Commonwealth as an agency of the Commonwealth." *See* 53 Pa.C.S. § 5505(a)(1); *see also Johnson v. Pennsylvania Hous. Fin. Agency*, 453 Pa. 329, 340–41, 309 A.2d 528, 534 (1973) (holding that the PHFA is a body corporate and politic, not a special commission). Finally, the Commonwealth Court rejected the constitutional challenge under the single-subject rule of Article III, Section 3, reasoning that the amendments, in addressing municipal authorities and parking authorities, cover one cohesive topic, namely, "authorities that benefit municipalities." *City of Phila.*, 817 A.2d at 1225 (citing *Pennsylvania Chiropractic Fed'n v. Foster*, 136 Pa.Cmwlth. 465, 583 A.2d 844 (1990) (upholding legislation on the single topic of restructuring the regulation of motor vehicle insurance)).

Judge Smith–Ribner, joined by President Judge Collins, filed a dissenting opinion, expressing her view that the City had standing, and that the case should not have been dismissed under the standard governing preliminary objections. *See City of Phila.*, 817 A.2d at 1226 (Smith–Ribner, J., dissenting). The dissent noted in particular that the City had alleged that the challenged amendments adversely affected its right to self-governance under its home rule charter, and pointed out that regulating parking has previously been deemed a local function. *See id.* at 1229 (citing *School Dist. of Phila. v. Zoning Bd. of Adjustment*, 417 Pa. 277, 207 A.2d 864 (1965)). The dissent additionally expressed its view that the City should have an opportunity to offer evidence concerning, *inter alia*, the financial risks that it now allegedly faces as a result of having guaranteed the bonds issued by the Parking Authority, and the impact upon City operations due to the City's reliance upon the asserted statutory pledge. *See id.* (citing *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 32, 97 S.Ct. 1505, 1523, 52 L.Ed.2d 92 (1977) (holding that New

York and New Jersey were bound by a statutory pledge regarding the Port Authority's finances while its bonds were outstanding)).

## II.

■ Initially, the parties have briefed the issue of whether the Commonwealth Court properly dismissed the City from the case for lack of standing. A party has standing to bring a cause of action if it is "aggrieved" by the actions complained of, that is, if its interest in the outcome of the litigation is substantial, direct, and immediate. *See In re Hickson,* 573 Pa. 127, 136, 821 A.2d 1238, 1243 (2003). Because the interests asserted in the different counts of the amended complaint are distinct, and because Appellees concede that the Mayor has standing relative to Count I, we will address the standing issue separately as to each count.

### A. Home rule

In Count I of the amended complaint, Appellants aver that Act 22 violates the City's home-rule rights under Article IX, Section 2 of the Pennsylvania Constitution, the First Class City Home Rule Act, and the Philadelphia Home Rule Charter. They argue that regulation of City parking is an inherently local function that does not affect any state-wide interest, and that, in dismissing this count, the Commonwealth Court overlooked that the General Assembly may not interfere with a home-rule municipality's governance of such activities. They also state that the ordinances by which the City created and expanded the Parking Authority provide for continued City control over the authority through mayoral appointment powers, and that the agreement of cooperation between the City and the Parking Authority delegates to the Parking Authority specific responsibilities pertaining solely to on- and off-street parking. They submit that Act 22 is inconsistent with this scheme as it eliminates the Mayor's powers and expands the Parking Authority's duties to include financing the City's public schools. Appellees respond that the home rule doctrine is inapplicable to this case because the

Parking Authority, from its inception, has been an agency of the Commonwealth and not of the City. They submit that the Legislature was therefore free to modify the structure and mandate of the Parking Authority when it enacted Act 22.[10]

Municipalities are creatures of the state and have no inherent powers of their own, *see Naylor v. Township of Hellam*, 565 Pa. 397, 403, 773 A.2d 770, 773 (2001); rather, they "possess only such powers of government as are expressly granted to [them] and as are necessary to carry the same into effect." *Appeal of Gagliardi*, 401 Pa. 141, 143, 163 A.2d 418, 419 (1960); *see also Philadelphia v. Fox*, 64 Pa. (14 Smith) 169, 180–81 (1870). Therefore, a municipality ordinarily lacks the power to enact ordinances except as authorized by statute, and any ordinance not in conformity with its enabling statute is void. *See Taylor v. Abernathy*, 422 Pa. 629, 633, 222 A.2d 863, 865 (1966). Under the concept of home rule, however, the locality in question may legislate concerning municipal governance without express statutory warrant for each new ordinance; rather, its ability to exercise municipal functions is limited only by its home rule charter, the Pennsylvania Constitution, and the General Assembly. *See In re Petition to Recall Reese*, 542 Pa. 114, 119, 665 A.2d 1162, 1164 (1995). *See generally* PA. JUR.2D *Municipal and Local Law* § 3:42 (2002); McQuillin, THE LAW OF MUNICIPAL CORPORATIONS § 10:13 (3d ed.2004); Gary E. French, *Home Rule in Pennsylvania*, 81 DICK. L.REV. 265 (1977).

The Pennsylvania Constitution guarantees the right of home rule. *See* PA. CONST. art. IX, § 2.[11] Because the grant

**10.** Appellees do not contest the Mayor's standing to pursue the issues raised in Count I of the amended complaint. Therefore, and in light of our ultimate disposition, it is unnecessary to decide whether the City also has standing as to this count. *See City of Pittsburgh v. Commonwealth*, 522 Pa. 20, 26 n. 3, 559 A.2d 513, 516 n. 3 (1989).

**11.** That provision states:

Municipalities shall have the right and power to frame and adopt home rule charters. Adoption, amendment or repeal of a home rule charter shall be by referendum. The General Assembly shall provide the procedure by which a home rule charter may be framed and its adoption, amendment or repeal presented to the electors. If the

of such right makes home rule subject to the procedures and substantive limitations imposed by the General Assembly, home rule must ordinarily occur, in the first instance, according to enabling legislation at the state level. The enabling law relevant to the present case is the First Class City Home Rule Act of 1949 (the "Home Rule Act").[12] In general terms, this act grants to first class cities (namely, Philadelphia) which adopt a home rule charter general authority of local self-government, including "complete powers of legislation and administration in relation to its municipal functions." 53 P.S. § 13131. This grant of powers is made subject to "the limitations, restrictions and regulations hereinafter prescribed." *id.; see* 53 P.S. § 13133 (setting forth express limitations).

A threshold question in determining whether the present claim is legally sufficient for relief is whether appointment authority over members of the Parking Authority falls within the City's home rule powers. Appellees, as noted, contend that, because the Parking Authority Law clarifies that parking authorities are Commonwealth entities, and not instrumentalities of the City, *see* 53 P.S. § 345(a) (recodified as amended at 53 Pa.C.S. § 5505(a)), the City has no home rule rights relative to the manner in which the Parking Authority's governing board is selected. For support, they point to this

General Assembly does not so provide, a home rule charter or a procedure for framing and presenting a home rule charter may be presented to the electors by initiative or by the governing body of the municipality. A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.

PA. CONST. art. IX, § 2. The above provision was placed into the Constitution in 1968; its predecessor, the former Article XV, Section 1, was adopted in 1922, and was substantively similar, as it stated that "[c]ities ... may be given [by the Legislature] the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature."

12. Act of April 21, 1949, P.L. 665 (as amended, 53 P.S. §§ 13101–13157).

Court's decision in *Herriman v. Carducci*, 475 Pa. 359, 380 A.2d 761 (1977), and note that that case also involved a Commonwealth entity (an urban redevelopment authority), the control of which, it was determined, was excluded from the city's home rule powers. Appellants, on the other hand, stress that parking is an inherently municipal function, and contend that the City's home rule powers supersede those of the state with respect to such functions; they distinguish *Herriman* by observing that, unlike the statute at issue in that case (the Urban Redevelopment Law), the Parking Authority Law specifically allows the City to delegate municipal functions to the Parking Authority, something the City has done through its ordinances and agreements with the authority.

Because *Herriman* is plainly germane here, it merits substantive examination. In that matter, Mr. Herriman had been appointed to succeed Mr. Carducci as a member of the Redevelopment Authority of the City of Williamsport. This appointment was made in accordance with Section 5 of the Urban Redevelopment Law,[13] 35 P.S. § 1705, which directs that the mayor make such appointments. Shortly before the appointment was made, however, the Williamsport City Council passed legislation requiring that any such appointment receive the council's prior approval. This Court observed, initially, that the statute under which Williamsport adopted its home rule charter, the Optional Third Class City Charter Law,[14] contained a provision granting to the city "full power to ... [o]rganize and regulate its internal affairs." *Herriman*, 475 Pa. at 362, 380 A.2d at 763 (quoting 53 P.S. § 41301(1)). Mr. Carducci asserted that the ordinance in question superseded Section 5 under the general grant of home rule powers. This Court disagreed, explaining that

the appointment of a member to the Redevelopment Authority does not concern "the internal affairs" of the city of Williamsport. The Urban Redevelopment Law § 4, explicitly states that an authority, once created, "shall in no way

13. Act of May 24, 1945, P.L. 991 (as amended, 35 P.S. §§ 1701–1719.2).
14. Act of July 15, 1957, P.L. 901 (as amended, 53 P.S. §§ 41101–41625).

be deemed to be an instrumentality of such city," and is in no way "engaged in the performance of a municipal function." 35 P.S. § 1704. An authority under the Urban Redevelopment Law is an agent of the Commonwealth and not of the local government body. *Id.* § 1709. As can be seen, the legislature in no uncertain terms has made it clear that a redevelopment authority is a completely separate entity from the city. The fact that the mayor of the city is authorized to make the appointment of its members does not make an appointment a matter concerning the internal affairs of the city.

*Id.* at 363, 380 A.2d at 763–64. The Court acknowledged that the Third Class City Charter Law itself states that the powers granted are to liberally construed, *see* 53 P.S. § 41304, but ultimately concluded that that provision "does not mean that a power not contained in § 303 should be included therein." *Id.* at 363, 380 A.2d at 764.

There is an obvious analogy between the situation presently under review and the one in *Herriman.* Here, as in *Herriman*, the home rule enabling statute indicates that it is intended only for the City's control of its internal affairs. *See, e.g.*, 53 P.S. §§ 13101 (granting general legislative and administrative powers in relation to "municipal functions"), 13133 (precluding the City from exercising any authority beyond its limits or from engaging in any proprietary or private business). Additionally, just as redevelopment authorities created under the Urban Redevelopment Law are not city instrumentalities, likewise, any parking authority created pursuant to the Parking Authority Law is declared to be a "body corporate and politic, exercising public powers of the Commonwealth as an agency thereof, and . . . shall in no way be deemed to be an instrumentality of the city[.]" 53 P.S. § 345(a). Thus, it would seem that, just as the Third Class City Charter Law's general grant of home rule governance did not subsume appointment powers relative to redevelopment authorities, so the Home Rule Act's general grant of home rule powers does not subsume appointment powers relative to parking authorities.

Notwithstanding these parallel factors, the City points out that, unlike the Urban Redevelopment Law, the Parking Authority Law specifically authorizes municipalities to delegate municipal functions to the authority created. In particular, Section 5(a) of the Parking Authority Law states, in relevant part:

The Authority, incorporated under this act, shall constitute a public body corporate and politic, exercising public powers of the Commonwealth as an agency thereof, and shall be known as the Parking Authority of the city, borough, or township of the first class, but shall in no way be deemed to be an instrumentality of the city, borough, or township of the first class or engage in the performance of a municipal function, *except such functions as are delegated to it by municipal ordinance or resolution passed pursuant to this act.*

53 P.S. § 345(a) (emphasis added) (recodified as amended at 53 Pa.C.S. § 5505(a)). The City argues that this is precisely what it has done, namely, that it has, by ordinance, delegated to the Parking Authority the responsibility to carry out parking regulation, a matter which this Court has deemed to be an essentially municipal function. *See School Dist. of Phila. v. Zoning Bd. of Adjustment,* 417 Pa. 277, 283, 207 A.2d 864, 868 (1965). Thus, Appellants state that, unlike in *Herriman,* the Parking Authority's activities do subsume the City's internal affairs. This is a relevant distinction, Appellants urge, because the Home Rule Charter Law explicitly grants to the City complete legislative and administrative powers over all municipal functions. *See* 53 P.S. § 13131.

This argument assumes that the City's home-rule authority to legislate relative to municipal functions implies that, whenever it delegates some of those functions to a separate entity, the City is legally entitled to remain in control of that entity regardless of its nature. We are not convinced, however, that this is true. In the first place, the Parking Authority is not a department of the City, but, as noted, is an agency of the Commonwealth which is created pursuant to an enabling statute separate from the Home Rule Act, *see* 53 P.S.

§§ 344(a) (relating to method of incorporation) (recodified as amended at 53 Pa.C.S. § 5504(a)), and which receives delegation of municipal functions pursuant to the same non-home-rule legislation, *see* 53 P.S. § 345(a) (relating to purposes and powers) (recodified as amended at 53 Pa.C.S. § 5505(a)). As the Commonwealth Court has explained:

> Unlike municipal corporations that have "governmental" and "proprietary" functions, authorities engage only in the latter.... Generally, authorities are established for the purpose of financing and managing various revenue producing projects of a public nature or other activities that are not considered to be part of core governmental activities; they are a governmental business venture, a form of quasi-privatization.

*SEPTA v. Union Switch & Signal,* 161 Pa.Cmwlth. 400, 404, 637 A.2d 662, 664–65 (1994). Although increasing the availability of parking spaces in the City helps reduce congestion—and in that sense serves a municipal need—there is a commercial aspect to operating parking facilities that generate a revenue stream, such as surface lots, parking garages, and airport parking facilities. Parking authorities, moreover, are empowered to engage in commercial leasing of the space that they own. *See* 53 P.S. § 345(a) (recodified at 53 Pa.C.S. § 5505). As the City's home rule governance does not include proprietary or business-type functions, *see* 53 P.S. § 13133, it is difficult to argue that exercising control over an authority which performs these functions is nonetheless included within such powers.[15]

15. This highlights an important difference between the present circumstances and those involved in *School Dist. of Phila.,* on which Appellants heavily rely. In that case, the issue was whether the City could enforce its zoning code vis-à-vis public school buildings, notwithstanding that the Home Rule Act precludes the City from regulating public education. The Court held that it could, reasoning, *inter alia,* that enforcement of parking-related zoning requirements serves the City's interest in reducing congestion and does not constitute the regulation of public education. *School Dist. of Phila.,* 417 Pa. at 283, 207 A.2d at 868. That decision does not suggest, however, that the City may advance those interests by undertaking projects with commercial characteristics.

Even if appointment powers relative to the Parking Authority did fall within the scope of the general home rule powers granted by the Home Rule Act when it was enacted, it does not follow that the Legislature could not remove such powers at a later date. That body retains express constitutional authority to limit the scope of any municipality's home rule governance, *see supra* note 11; *Ortiz v. Commonwealth,* 545 Pa. 279, 283–84, 681 A.2d 152, 155 (1996); *Cali v. City of Phila.,* 406 Pa. 290, 297–98, 177 A.2d 824, 828 (1962), and indeed, Section 18 of the Home Rule Act enumerates several such limitations. *See* 53 P.S. § 13133. While we acknowledge Appellants' citation to a line of decisions in which this Court interpreted Section 18 to signify that ordinances pertaining to matters of strictly local concern supersede conflicting, generally-applicable state law, *see Bartle v. Zoning Bd. of Adjustment,* 391 Pa. 207, 137 A.2d 239 (1958); *Ebald v. City of Phila.,* 387 Pa. 407, 128 A.2d 352 (1957); *In re Addison,* 385 Pa. 48, 122 A.2d 272 (1956); *Lennox v. Clark,* 372 Pa. 355, 93 A.2d 834 (1953), those cases lack application to the present controversy, as the challenged provisions of Act 22 are not generally applicable, but pertain only to Philadelphia. Notably, the Constitution does not prescribe any particular means that the General Assembly must utilize in constraining home rule powers. Although Section 18 of the Home Rule Act reflects one method of imposing constraints, there is no reason to suppose that additional limitations may not be imposed by other means, including legislation extrinsic to the Home Rule Act. *See generally* French, *Home Rule in Pennsylvania,* 81 Dick. L.Rev. at 280 (discussing "preemption" of home rule powers through legislation extrinsic to the home rule enabling act). Particularly as both the Home Rule Act and the challenged provisions of Act 22 pertain to first class cities, and only first class cities, we conclude that, to the extent there is any conflict between these two enactments, Act 22 limits the City's home rule rights in a manner that is consistent with Article IX, Section 2 of the Pennsylvania Constitution. Accordingly, the Commonwealth Court did not err in granting the demurrer as to Count I of the amended complaint.

## B. Statutory pledge

In Counts II–V of the amended complaint, Appellants assert that, in enacting Act 22, the General Assembly violated a binding statutory pledge contained in Sections 12 and 13 of the Parking Authority Law. According to Appellants, the Legislature pledged to deny parking authorities the power to harm the security of bondholders, *see* 53 P.S. § 352 (recodified as amended at 53 Pa.C.S. § 5512), and also promised not to alter the rights of parking authorities until all of its outstanding bonds were retired, *see* 53 P.S. § 353 (recodified as amended at 53 Pa.C.S. § 5513).[16] Appellants argue that Act 22 breaches this pledge by curtailing the Parking Authority's right to dispose of its retained earnings in the manner that best advances its own financial health, and thereby promotes the security of its bondholders. They also contend that, in reliance upon these promises, the City: created the Parking Authority in the first instance; lent its credit to the authority to enhance the marketability of its bonds; leased parking facilities to the authority; and delegated to the authority the responsibility to enforce on-street parking regulations. They state that the City is now at risk of financial harm in the event that the Parking Authority defaults on its bonds due to the legislative command to subsidize the Philadelphia School District. Appellants thus maintain that the amendments under review are constitutionally prohibited, and cite, for support, to

16. Sections 12 and 13, which were reenacted substantially unmodified under Act 22, provide, respectively:

> The use of the facilities of the Authority and the operation of its business shall be subject to the rules and regulations from time to time adopted by the Authority; Provided, however, That the Authority shall not be authorized to do anything which will impair the security of the holders of the obligations of the Authority, or violate any agreements with them or for their benefits [sic].

53 P.S. § 352.

> The Commonwealth does hereby pledge to and agree with any person, firm or corporation, or Federal agency subscribing to, or acquiring the bonds to be issued by the Authority for the construction, extension, improvement, or enlargement of any project or part thereof, that the Commonwealth will not limit or alter the rights hereby vested in the Authority until all bonds at any time issued, together with the interest thereon, are fully met and discharged....

53 P.S. § 353.

*United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), in which the Supreme Court held that New York and New Jersey could not, consistent with the Contract Clause,[17] violate a statutory pledge not to alter the powers and rights of the Port Authority while that entity's bonds were outstanding.

Appellees counter that Appellants lack standing to raise this issue, as neither the Mayor nor the City claims to be a bondholder. They also aver that, even if standing exists, no relief is due because no statutory pledge has been broken. In this regard, they argue that the bondholders' rights are adequately protected by statutory safeguards built into the amended statute.

 As to standing, we agree with Appellees that the Mayor has not identified any discernible interest that could be affected by the alleged harms reflected in these counts, as he does not claim to be a bondholder or specify any manner in which the powers or obligations of his office have been altered. Therefore, he lacks standing to raise Counts II–V of the amended complaint. The City, however, asserts that it is the guarantor of the Parking Authority's bonds and, as such, is subject to an augmented financial risk due to the latter's mandate to transfer substantial funds to the Philadelphia School District. We find this interest sufficient to confer standing upon the City relative to these counts of the complaint.

 Nevertheless, the allegations contained in these counts are insufficient for relief. The only portion of Section 12 of the Parking Authority Law that the City contends is relevant to these claims is that which states that the Authority "shall not be authorized to do anything which will impair the security of the holders of the obligations of the Authority, or violate any agreements with them or for their benefits [sic]." 53 P.S. § 352; *see supra* note 16. While this provision articulates a restriction on the Parking Authority's powers as

17. U.S. CONST. art. 1, § 10, cl. 1 (prohibiting the states from passing laws impairing the obligations of contracts).

they existed under the prior version of the statute, it does not constitute a pledge on the part of the Legislature never to alter those powers in the future. *See generally In re Marshall,* 363 Pa. 326, 337, 69 A.2d 619, 626 (1949) ("Legislative power is the power to make, alter, and repeal laws." (internal quotation marks omitted)).

 Even if it were deemed to constitute a pledge, Act 22 does not violate it, as the act places bondholders' interests above those of the Philadelphia School District. As recited above, the relevant provision of Act 22 prohibits an initial transfer of funds to the extent such action could "jeopardize the authority's ability to meet debt service payments or to retire outstanding bonds." 53 Pa.C.S. § 5508.1(q). The next sentence in that subsection indicates that fund transfers in subsequent years may only occur to the degree that the Parking Authority deems the money "available" for use by the school district. *See id.* In light of the preceding sentence, it is evident that the Legislature did not intend for the Parking Authority to consider any monies available for transfer which are needed to meet the authority's outstanding obligations. *See O'Rourke v. Commonwealth,* 566 Pa. 161, 173, 778 A.2d 1194, 1201 (2001) (indicating that statutory words should be interpreted with reference to the context in which they appear). This interpretation is confirmed by the Legislature's decision to carry over Section 12's prohibition against parking authorities "do[ing] anything which will impair the security of the holders of the[ir] obligations ... or violate agreements with them or for their benefit" into the new, codified version of the law. *See* 53 Pa.C.S. § 5512(b). Here, the term "anything" plainly includes transferring funds to the school district. Therefore, we agree with Appellees that the bondholders' interests are not jeopardized by the Act 22 amendments.[18]

---

18. By the same token, if federal law requires certain earnings to be designated for airport use, as Appellants contend, the Parking Authority cannot, consistent with legislative intent, consider such monies available for transfer to the school district, as this would lead to an unreasonable result. *See* 1 Pa.C.S. § 1922(1).

Nor does Section 13 of the prior version of the law provide a basis for relief premised upon the Contract Clause. It is true that that provision, unlike Section 12, contains an express statutory pledge on the part of the Commonwealth not to "limit or alter" a parking authority's rights until all bonds are retired. As already noted, however, the bondholders' interests are given primacy. Therefore, even if Appellants are correct in stating that the Parking Authority's rights have somehow been altered by the statutory command to transfer available funds to the school district, this alteration does not implicate the pledge that Appellants contend has been breached.[19]

Finally, the City's contention that it was induced to create the Parking Authority and enter into various contracts with that entity in reliance upon the prior state of legislative affairs does not state a claim under the Contract Clause (or any other constitutional prohibition), as it does not rest upon an allegation that the obligations of a contract have been impaired.[20] Rather, the argument sounds in estoppel. However, the Legislature's authority is not constitutionally constrained by estoppel precepts. See Erie & North-East R.R. v. Casey, 26 Pa. (2 Casey) 287, 304 (1856) ("A statute may be valid, no matter how inconsistent it is with the doctrine of

19. Appellants' argument on this point lacks citation to legal authority apart from a brief discussion of United States Trust Co. In that matter, however, the disputed legislation was not susceptible of an interpretation that would protect the interests of the pledge's beneficiaries, i.e., the bondholders. In particular, New Jersey and New York made a statutory covenant with the Port Authority's prospective creditors that none of the funds reserved to secure repayment of the loans would be used to subsidize rail passenger service. Twelve years later, the two states repealed the covenant retroactively, and allowed the reserve funds to be used for that purpose, thus "totally eliminating an important security provision" of the outstanding bond issues. United States Trust Co., 431 U.S. at 19, 97 S.Ct. at 1516. Because of our interpretation of Act 22, as discussed above, the same is not true of the legislation challenged here.

20. The text of the state and federal contract clauses is substantively identical. In their brief, Appellants neither cite to the state provision nor suggest that it should be interpreted to provide greater protection than its federal counterpart. See generally Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887 (1991).

estoppel, unless the doctrine of estoppel be a part of the constitution, which it certainly is not.").

## C. Other claims

In Counts VI–IX of the amended complaint, Appellants raised constitutional challenges to Act 22 relating to impermissible special legislation, *see* PA. CONST. art. III, § 32, lack of publication in the affected locality, *see* PA. CONST. art. III, § 7, improper delegation, *see* PA. CONST. art. III, § 31, and violation of the single subject rule, *see* PA. CONST. art. III, § 3. Appellants did not state these issues in their list of questions presented on appeal, nor have they discussed them in the body of their brief or included them in their prayer for relief. Hence, these claims are abandoned.

## III.

Having found that the Commonwealth Court acted properly in sustaining Appellees' demurrer as to Counts I–V of the amended complaint, and that Appellants have abandoned the remainder of their claims, we affirm the order of the Commonwealth Court dismissing the amended complaint.

Justice NIGRO files a concurring opinion.

Justice NIGRO, concurring.

I agree with the majority that the Commonwealth Court properly dismissed Appellants' amended complaint. Notably, however, the majority cites to *Ortiz v. Commonwealth,* 545 Pa. 279, 681 A.2d 152 (1996), for the proposition that the General Assembly has the authority to limit the scope of a municipality's home rule powers. *See* Majority Slip Op. at 18 (citing *Ortiz v. Commonwealth,* 545 Pa. 279, 681 A.2d 152, 155 (1996)). I dissented in *Ortiz* based on my continuing belief that there is an exception to the above proposition insofar as the General Assembly does not have the right to restrain a municipality from using its home rule powers to enact an ordinance concerning a major public safety, health, or welfare problem where the General Assembly has not enacted a statute itself to

address the problem. *See Ortiz,* 681 A.2d at 157 (Nigro, J., dissenting). Nevertheless, because the matter at issue here, *i.e.,* the power to appoint members to the Parking Authority, is not a major public safety, health, or welfare problem, I agree with the majority that even if home rule powers are implicated here, the General Assembly had the authority to enact Act 22 and thereby restrain the City from using such powers to appoint members to the Parking Authority.