# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Chester Water Authority Trust | : | |
| | : | |
| | : | No. 489 C.D. 2020 |
| Appeal of: City of Chester | : | |
| | | |
| In Re: Petition for Approval of Declaration of Trust Under Pennsylvania Law and the Transfer of Legal Title to Certain Assets to the Trust | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 504 C.D. 2020 |
| | : | |
| Appeal of: Aqua Pennsylvania, Inc. | : | |
| | | |
| City of Chester, | : | |
|                  Appellant | : | |
| | : | No. 514 C.D. 2020 |
|        v. | : | |
| | : | |
| Chester Water Authority | : | |
| | | |
| In Re: Petition for Approval of Declaration of Trust Under Pennsylvania Law and the Transfer of Legal Title to Certain Assets to the Trust | : | |
| | : | |
| | : | |
| | : | No. 685 C.D. 2020 |
| | : | |
| | : | Argued: November 10, 2020 |
| Appeal of: Aqua Pennsylvania, Inc. | : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge[1]
                   HONORABLE RENÉE COHN JUBELIRER, Judge
                   HONORABLE P. KEVIN BROBSON, Judge
                   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE ANNE E. COVEY, Judge
                   HONORABLE MICHAEL H. WOJCIK, Judge
                   HONORABLE ELLEN CEISLER, Judge

---

[1] This case was assigned to the opinion writer before Judge Brobson succeeded Judge Leavitt as President Judge.

OPINION BY
JUDGE McCULLOUGH                           FILED:  September 16, 2021

In these consolidated appeals from orders that involve an issue of law that was certified by the Court of Common Pleas of Delaware County (trial court) and accepted by this Court for review pursuant to Pa.R.A.P. 1311(b), the City of Chester (City) and Aqua Pennsylvania, Inc. (Aqua) appeal from the April 24, 2020 orders of the trial court, which, in relevant part, denied the motions for judgment on the pleadings filed by the City and Aqua in two separate but related actions.

The narrow issue for our consideration is whether section 5622(a) of the Municipality Authorities Act (MAA),[2] 53 Pa.C.S. §5622(a), authorizes (or, more appropriately, continues to authorize) a municipality to obtain the assets of a water authority that it created—a water authority that eventually expanded to provide water services outside the borders of the municipality and into other counties—in light of section 1 of Act 73 of 2012,[3] which added section 5610(a.1) to the MAA, 53 Pa.C.S. §5610(a.1.), and transformed the governance structure of such an authority.  Upon review, we conclude that section 5610(a.1) did not abrogate, supersede, or otherwise alter a municipality's longstanding power under section 5622(a) and its statutory predecessors to unilaterally obtain an authority and/or its assets, and, accordingly, we reverse the orders of the trial court and remand for further proceedings.[4]

_____

[2] 53 Pa.C.S. §§5601-5623.

[3] Act of June 27, 2012, P.L. 653, No. 73, §1.

[4] We emphasize the very limited nature of the issue before this Court.  In this case, we decide only whether a municipality, under section 5622(a), possesses the general authority to obtain the assets of an authority that it created.  We do not decide the manner or extent to which a municipality can utilize or exercise such authority.

2

As gleaned from the pleadings and the trial court's opinion, the facts and procedural history of these cases may be summarized as follows. In 1939, after our General Assembly adopted the MAA of 1935 (1935 MAA),[5] the City incorporated the Chester Municipal Authority as a water authority. In 1965, the City enacted an ordinance that changed the name of the authority to the Chester Water Authority (Authority). In 1965, and again in 1998, the City renewed the Authority's charter in accordance with the 1945 MAA.

Originally, the Authority provided water services to customers solely in the City, but later expanded its services beyond the City into Delaware County and the southern part of Chester County, where the Authority's water system assets are currently sited. As noted by the trial court, "[t]he Authority commenced in 1939 with 67 customers in the City and it presently serves over 200,000 customers in 33 separate municipalities located in Chester and Delaware County. Approximately 21[%] of [the Authority's] customers reside in the City." (Trial court op. at 4.)

From 1939 to 2012, in accordance with the provisions of the 1935 MAA and 1945 MAA, the City appointed all five directors of the Authority's governing body, and its members were from the City. After section 5610(a.1) of the MAA became effective on August 27, 2012, the composition of the Authority's governance structure changed to a nine-member body. Pursuant to section 5610(a.1) of the MAA, the governing body of the Authority consists of three members from the City, three members from Chester County, and three members from Delaware County.

---

[5] Act of June 28, 1935, P.L 463, No. 191. The 1935 MAA was simultaneously repealed and replaced by the Municipality Authorities Act of 1945 (1945 MAA), Act of May 2, 1945, P.L 382, No. 164, *as amended*, *formerly* 53 P.S. §§301-322. Later, section 3 of the Act of June 19, 2001, P.L. 287 (2001 Act), repealed the 1945 MAA and replaced the 1945 MAA with the current MAA.

In 2017, Aqua made an unsolicited bid to purchase the Authority in the alleged amount of $320,000,000. At that time, the Authority's nine-member board, or governing body, voted unanimously to reject the offer. The City, facing financial hardships, then started to explore methods to monetize the assets of the Authority.

On January 24, 2019, the Authority executed a declaration of trust, naming the Authority as the settlor and three of its board members as trustees. By its terms, the trust contemplated that the Authority would transfer its assets into the trust.

On March 1, 2019, the Authority filed a petition in the trial court seeking approval of the declaration of trust and transfer of the Authority's assets into the trust. Thereafter, various answers, new matters, and objections to the petition were filed by interested parties, including the City and Aqua. After the pleadings were closed, Aqua and the City filed separate motions for judgment on the pleadings in the trust petition action. In short, Aqua and the City asserted that the Authority's petition should be denied because, as a matter of law, only the City had the power to transfer the Authority's assets under section 5622(a) of the MAA.

Meanwhile, on August 13, 2019, the City filed an amended complaint in the trial court against the Authority, seeking, *inter alia*, a declaratory judgment that section 5622(a) of the MAA vested it with the statutory authority to unilaterally obtain and sell the Authority. The City also sought an injunction enjoining the Authority from interfering with the City's right to sell the Authority's assets, from encumbering or dissipating the Authority's assets, and from burdening the Authority's assets with any new debt. The Authority filed a responsive pleading, and the City later moved for judgment on the pleadings in the declaratory judgment action.

By order dated April 24, 2020, the trial court denied the City's motion for judgment on the pleadings in the declaratory judgment action. By separate order dated

4

April 24, 2020, in the trust petition action, the trial court denied the motions for judgment on the pleadings filed by the City and Aqua. The reasoning utilized by the trial court, common to both cases, was as follows:

> 18. The 2012 legislative amendment to [s]ection 5610(a.1) established the City [], the County of Chester, and the County of Delaware as the governing body of the [Authority].
>
> 19. This amendment requires that any conveyance of the [Authority] pursuant to [s]ection 5622(a) be conducted and authorized by the City [], the County of Chester, and the County of Delaware as the governing body which has the power collectively to establish, maintain, or operate the projects of the [Authority].

(Trial court op. at 6.) Ultimately, the trial court concluded "that any transfer of all [the Authority's] assets be conducted solely by the governing body, to wit, the City [], Delaware County[,] and Chester County in unison pursuant to [s]ections 5610(a.1) and 5622(a) of the MAA." *Id.* at 7.

Subsequently, the City and Aqua filed separate applications to amend the trial court's April 24, 2020 orders to set forth a statement that its interlocutory orders involved a controlling question of law as to which there was a substantial ground for difference of opinion and that an immediate appeal from the orders could materially advance the ultimate termination of the cases. *See* section 702(b) of the Judicial Code, 42 Pa.C.S. §702(b). In an order dated May 21, 2020, the trial court granted the applications and amended its April 24, 2020 orders accordingly. The City and Aqua then filed petitions for permission to appeal in this Court, *see* Pa.R.A.P. 1311(b), in both the trust petition case and the declaratory judgment case. On June 24, 2020, this Court granted the permissions to appeal in a *per curiam* order. As stated in that order, we accepted the following, sole issue for review in the trust petition case:

5

> Whether the 2012 amendment[] to the [MAA], establishing the City [], Chester County, and Delaware County as the governing body of the [Authority], require[s] that any conveyance of the Authority's assets pursuant to the [MAA] be conducted and authorized by the governing body rather than solely by the City [].

(Order, 6/24/2020, at 2.)

In our *per curiam* order, we also accepted a substantially similar, if not identical, issue for our review in the declaratory judgment case, which we phrased as follows:

> [Whether] the 2012 legislative amendment to [s]ection 5610(a.1) [of the MAA] established the City of Chester, the County of Chester, and the County of Delaware as the governing body of the [Authority and whether] [t]his amendment requires that any conveyance of the [Authority] pursuant to [s]ection 5622(a) be conducted and authorized by the City of Chester, the County of Chester, and the County of Delaware as the governing body which has the power collectively to establish, maintain or operate the projects of the [Authority].

*Id.*[6]

---

[6] As an aside, and as noted by the trial court, in addition to the trust petition case and the declaratory judgment case, there are two other civil actions related to this matter that are currently pending in the civil and orphans' divisions of the Court of Common Pleas of Delaware County, and, in total, the parties currently have eight appeals pending in this Court (aside from the ones we granted petitions for permission to appeal), which were stayed by agreement of counsel. (Trial court op. at 2-3.) Notably, in our June 24, 2020 *per curiam* order, we directed that "[a]ll proceedings in this matter before the Court of Common Pleas of Delaware County are stayed pending resolution of [these] appeals." (Order, 6/24/2020, at 3.)

Moreover, in the background of this litigation, the Secretary of the Community and Economic Development (CED) filed an application in our original jurisdiction for the appointment of a receiver for the City in pursuant to the Municipalities Financial Recovery Act (Act 47), Act of July 10, 1987, P.L. 246, No. 46, *as amended*, 53 P.S. §§11701.101-11701.712. *See generally Davin v. City of*

**(Footnote continued on next page…)**

**Discussion**

In its appellate brief, the City highlights the legislative and legal history of section 5622(a) of the MAA, particularly the case law that construed the former version of section 5622(a) in the 1945 MAA, the apparent legislative adoption of that case law in reenacting the MAA in 2001, and the subsequent case law that developed in interpreting section 5622(a) of the MAA. According to the City, this body of law conclusively establishes that section 5622(a) of the MAA vests it (the City) with the unfettered power to unilaterally transfer the Authority, and all of its assets, on the City's own free will and terms without any input from the Authority itself. The City also asserts that the relatively recent amendment codified in section 5160(a.1) of the MAA does not provide the Authority with any foundation upon which to conclude that our General Assembly divested the City of its statutory power to transfer or otherwise control the Authority as a municipal entity that it created. For its part, Aqua advances arguments that are largely duplicative of that forwarded by the City. Upon review, we find merit in this line of argumentation.

---

*Chester* (Pa. Cmwlth., No. 336 M.D. 2020, filed June 22, 2020) (unreported) (*Davin I*). In *Davin I*, a judge from this Court noted that the City had been designated as a distressed municipality under Act 47 since 1995; the City adopted a recovery plan in 1996; and, due to difficult and changing economic conditions, the City filed amendments to the recovery plan in 2006, 2013, and 2016. *Id.*, slip op. at 1-2, 9. This Court further explained that, as a result of the City's continuing financial crisis, Governor Tom Wolf issued a Declaration of Fiscal Emergency as to the City on April 13, 2020. *Id.* Ultimately, this Court concluded that the "City [was] projected to be insolvent within 180 days[] and [was] unable to ensure the continued provision of vital and necessary services," and, on June 22, 2020, we granted CED's petition, appointed a Receiver for the City, and ordered the Receiver to file a recovery plan within 30 days of our order. *Id.*, slip op. at 6, 9. Then, on June 7, 2021, this Court entered an order confirming the 2021 Revised Recovery Plan filed by the Receiver, concluding that the plan, *inter alia*, "contains a number of initiatives that set forth short- and long-term strategies to address structural issues" and "proposes certain initiatives . . . to address the fiscal emergency and continue to provide necessary and vital services in the City." *Davin v. City of Chester* (Pa. Cmwlth., No. 336 M.D. 2020, filed June 7, 2021) (unreported) (*Davin II*), slip op. at 6-7.

7

We begin with a review of section 5622(a) of the MAA, in its current iteration, and proceed to the history of that section as it appeared in preceding versions of the MAA.

Titled "[c]onveyance by authorities to municipalities or school districts of established projects," section 5622(a) of the MAA presently states as follows:

> (a) *Project.*--If a project established under this chapter by a board appointed by a municipality is of a character which the municipality has power to establish, maintain or operate and the municipality desires to acquire the project, it may by appropriate resolution or ordinance adopted by the proper authorities signify its desire to do so, and the authorities shall convey by appropriate instrument the project to the municipality upon the assumption by the municipality of all the obligations incurred by the authorities with respect to that project.

53 Pa.C.S. §5622(a).

In *Clearfield Borough v. Clearfield Borough Park Authority*, 285 A.2d 532 (Pa. Cmwlth. 1971), *affirmed*, 301 A.2d 372 (Pa. 1973) (*per curiam*), this Court interpreted former section 18(A) of the 1945 MAA, *formerly* 53 P.S. §321(A), which contains language that is virtually identical to current section 5622(a) of the MAA.[7] In

---

[7] Specifically, former section 18(A) of the 1945 MAA read as follows:

> If a project shall have been established under this act by a board appointed by a municipality or municipalities, which project is of a character which the municipality or municipalities have power to establish, maintain or operate, and such municipality or municipalities desire to acquire the same, it or they may by appropriate resolution or ordinance *adopted by the proper Authorities*, signify its or their desire to do so, and thereupon the Authorities shall convey by appropriate instrument said project to such municipality or municipalities, upon the assumption by the latter of all the obligations incurred by the Authorities with respect to that project.

*Formerly* 53 P.S. §321(A) (emphasis added).

8

that case, a borough established a park authority in 1955 to acquire, maintain, improve, and operate certain park property. The authority acquired park property in 1958 and operated and maintained it. In 1970, the borough passed an ordinance indicating its desire to obtain the authority's property and demanding conveyance of the property to the borough. The authority refused, and the borough filed an action in mandamus, seeking to compel the conveyance. The court of common pleas, construing the phrase "adopted by the proper authorities," concluded that former section 18(A) required "that a resolution must be passed by the [a]uthority approving the transfer of the project property before the municipality can acquire the property." 285 A.2d at 533. As such, the court of common pleas denied the borough's mandamus petition.

On appeal, this Court reversed. Acknowledging that the term "authorities" was ambiguous, we analyzed the legislative intent behind former section 18(A), and, focusing upon the plain language of the statute, this Court, in pertinent part, proffered the following reasoning in support of our disposition:

> After first establishing the subject matter ("project established by a board" which "the municipality or municipalities have power to establish"), the statute next sets forth the words which give the section its purpose ("such municipality or municipalities desire to acquire the same"). Immediately following this are words describing how the purpose is accomplished ("it or they may by appropriate resolution or ordinance"). The words, "it or they" are pronouns referring back to the nearest nouns preceding them, which are "municipality or municipalities." The next words "adopted by the proper Authorities[,]" being a part of the same phrase[,] must also refer to those governmental bodies which can pass the resolution or ordinance. This analysis is further aided by the next phrase, "signify *its* or *their* desire to do so," for here the only party (or parties) whose desire sets in motion this process is the municipality or municipalities.
>
> . . . .

9

This analysis leads to only one conclusion, and that is that the Legislature intended that the resolution or ordinance should be adopted by the proper authorities [], meaning the municipality or municipalities.

We also note that the Legislature in [s]ection 18[(A)], used the terms "resolution or ordinance." We can find nothing in the statute which would permit an authority organized under [the 1945 MAA] to pass an ordinance. An authority throughout this [a]ct may pass a resolution, but nowhere may it pass an ordinance. For this additional reason, we hold that the Legislature intended to permit a transfer of authority property by the unilateral action of a municipality or municipalities.

. . . .

Based upon the above analysis of [s]ection 18[(A)] of the [1945 MAA], we hold that the legislative intent is to permit the [b]orough to obtain the project property of the [a]uthority by the passage of a borough resolution or ordinance expressing a desire to acquire such property and to assume all the obligations applicable to the property being acquired, and therefore we must reverse the court below.

285 A.2d at 534-35 (emphasis in original).

Decades later, in 1995, in *Forward Township Sanitary Sewage Authority v. Township of Forward*, 654 A.2d 170 (Pa. Cmwlth. 1995), a township organized and incorporated a sewage authority to undertake sanitary sewage projects in the township. The township later enacted a resolution to dissolve the authority and directed the authority to convey to the township all property in which the authority had any right and title. In upholding the validity of the township's resolution under former section 18(A) of the 1945 MAA, we reaffirmed our holding in *Clearfield Borough* that section 18(A) evinced that "the legislature intended to permit a transfer of authority property by the unilateral action of a municipality in enacting a resolution" and "that there is no

10

requirement that the authority itself authorize the transfer of property." *Forward Township Sanitary Sewage Authority*, 654 A.2d at 174. We further added that, "pursuant to [former] section 18(A), a municipality may, by ordinance, impose upon an authority the duty of executing the necessary documents for a transfer of all of the authority's property to its creating municipality." *Id.* at 174-75. Ultimately, this Court concluded that "[the] [a]uthority was not required to approve of the transfer of property from [the] [a]uthority to [the] [t]ownship" because the township, alone, possessed that right as a matter of statutory law. *Id.* at 175.

Then, in *Township of Forks v. Forks Township Municipal Sewer Authority*, 759 A.2d 47 (Pa. Cmwlth. 2000), we reiterated that section 18(A) of the 1945 MAA and our settled case law "lead to the inescapable conclusion that for the purpose of dissolving an authority[,] a municipality has the power to unilaterally direct its authority to transfer authority property without the consent of the authority." *Id.* at 54.

In 2001, our General Assembly repealed the 1945 MAA and replaced it by adding the MAA in Chapter 56 to the Pennsylvania Consolidated Statutes. *See supra* note 5. Significantly, section 2 of the 2001 Act provides that "[t]he provisions of [the MAA], so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments." *Id.* Further, section 4 of the 2001 Act states, in part, "that . . . decisions which were made under the [1945 MAA] shall remain in full force and effect until revoked, vacated or modified under [the MAA]." *Id.* Thus, in reenacting the 1945 MAA in its current version in the consolidated statutes in what is now known as the MAA, the General Assembly expressed its clear intent to preserve existing case law interpreting the 1945 MAA, unless or until a provision of the MAA provides to the contrary.

11

Following the statutory recodification of the MAA in 2001, this Court issued our decision in *Salem Township Municipal Authority v. Township of Salem*, 820 A.2d 888 (Pa. Cmwlth. 2003). There, albeit in passing, we reconfirmed that, based on its plain language, current section 5622(a) of the MAA "authorized the [t]ownship to dissolve the [a]uthority." *Id.* at 890 n.1.

Against this backdrop and historical framework, the General Assembly passed Act 73 of 2012, which added subsection (a.1) to section 5610 of the MAA. Placed in its proper statutory context, the provision that has always been titled, "[g]overning body," including within the 1945 MAA, now reads as follows with the additional language highlighted:

> (a) *Board.*--**Except as set forth in subsection (a.1)**, the powers of each authority shall be exercised by a board composed as follows:
>
> (1) If the authority is incorporated by one municipality, the board shall consist of a number of members, not less than five, as enumerated in the articles of incorporation. The governing body of the municipality shall appoint the members of the board, whose terms of office shall commence on the effective date of their appointment. One member shall serve for one year, one for two years, one for three years, one for four years and one for five years commencing with the first Monday in January next succeeding the date of incorporation or amendment. If there are more than five members of the board, their terms shall be staggered in a similar manner for terms of one to five years from the first Monday in January next succeeding. Thereafter, whenever a vacancy has occurred by reason of the expiration of the term of any member, the governing body shall appoint a member of the board for a term of five years from the date of expiration of the prior term to succeed the member whose term has expired.
>
> . . . .

12

**(a.1)** *Water authorities and sewer authorities.*--**If a water or sewer authority incorporated by one municipality provides water or sewer services to residents in at least two counties and has water or sewer projects in more than two counties where the combined population of the served municipalities, excluding the incorporating municipality, is at least five times the population of the incorporating municipality, all of the following apply:**

**(1) Ninety days after the effective date of this subsection, the governing body in existence on the effective date of this subsection shall be replaced by a governing body comprised of the following:**

**(i) Three members appointed by the governing body from each county in which the services to residents are provided. A member under this subparagraph must reside in a town, township or borough, which receives services from the authority.**

**(ii) Three members appointed by the governing body of the incorporating municipality.**

**(2) A member serving under paragraph (1) shall serve for a term of five years.**

53 Pa.C.S. §5610(a)(1), (a.1), (2) (emphasis added).

Here, the trial court essentially determined that the addition of section 5610(a.1) to the MAA in 2012 somehow displaced the interpretive construction provided to section 5622(a) of the MAA and its previous versions by this Court in *Clearfield Borough*, *Forward Township Sanitary Sewage Authority*, *Township of Forks*, and *Salem Township Municipal Authority*. The trial court concluded that section 5610(a.1) "requires that any conveyance of the [Authority] pursuant to [s]ection 5622(a) be conducted and authorized by the City[], the County of Chester, and the County of Delaware" because, collectively, these governmental entities constitute the

13

"governing body of the [Authority]" and have "the power [] to establish, maintain, or operate the projects of the [Authority]." (Trial court op. at 6.)

To determine whether the trial court's conclusion is valid, this Court is required to perform the familiar task of statutory interpretation. As oft stated, "[s]tatutory interpretation is a question of law over which our standard of review is *de novo*, and our scope of review plenary." *Commonwealth v. Kingston*, 143 A.3d 917, 921 (Pa. 2016). The cardinal rule of all statutory interpretation is to ascertain and effectuate the intent of the General Assembly. *O'Rourke v. Department of Corrections*, 778 A.2d 1194, 1201 (Pa. 2001). To accomplish that goal, "statutory language must be read in context, that is, in ascertaining legislative intent, every portion of statutory language is to be read together and in conjunction with the remaining statutory language, and construed with reference to the entire statute as a whole." *Pennsylvania Gaming Control Board v. Office of Open Records*, 103 A.3d 1276, 1285 (Pa. 2014). Where the words of a statute are clear and free from ambiguity, the legislative intent is to be gleaned from those very words, and the plain language is not to be disregarded under the pretext of pursuing its spirit. *Pennsylvania Financial Responsibility Assigned Claims Plan v. English*, 664 A.2d 84, 87 (Pa. 1995); *Coretsky v. Board of Commissioners of Butler Township*, 555 A.2d 72, 74 (Pa. 1989). "Only if a statute is unclear may a court embark upon the task of ascertaining the intent of the legislature by reviewing the necessity of the act, the object to be attained, circumstances under which it was enacted and the mischief to be remedied." *Coretsky*, 555 A.2d at 74.

Most significantly, our judicial interpretations set forth in the cases mentioned directly above have become part of former section 18(A) of the 1945 MAA, and, in the case of *Salem Township Municipal Authority*, section 5622(a) of the current MAA. This is because "judicial construction of a statute is an authoritative statement

14

of what the statute meant before as well as after the decision . . . giving rise to that construction." *Kendrick v. District Attorney of Philadelphia County*, 916 A.2d 529, 538 (Pa. 2007) (internal citation omitted). Further, the General Assembly is "presumed to be aware of the construction placed upon statutes by the courts." *City of Philadelphia v. Clement and Muller, Inc.*, 715 A.2d 397, 399 (Pa. 1998). Thus, "[t]he failure of the General Assembly to change the law which has been interpreted by the courts creates a presumption that the interpretation was in accordance with the legislative intent; otherwise the General Assembly would have changed the law in a subsequent amendment." *Fonner v. Shandon, Inc.*, 724 A.2d 903, 906 (Pa. 1999).

As a threshold matter, then, this Court must assume that our decisions interpreting former section 18(A) of the 1945 MAA, as well as section 5622(a) of the MAA, correctly enunciated the principle of law that our General Assembly intended to bestow within those statutory sections. As explained above, our decisions clearly held that former section 18(A) of the 1945 MAA and section 5622(a) of the current MAA provide a municipality with the unilateral authority to obtain the assets of an authority it had created. "If the interpretation placed upon the statute for all these years was not the interpretation intended by the legislature, it would have amended the section." *Northeastern Building Registered v. Commonwealth*, 399 A.2d 449, 452 (Pa. Cmwlth. 1979). Importantly, our General Assembly has not amended the 1945 MAA or section 5622(a) of the MAA with any material language that could call into question the construction placed upon those statutes by this Court in cases beginning as early as 1971 and reaffirmed throughout the years, most recently in 2003.

Equally important is the proposition that "when the legislature, in subsequent legislation, chooses to use the same disputed language as it had used in previous legislation, and where, as here, that language has been interpreted . . . by a

court, the legislature may be presumed to have adopted [that] interpretation[].” *Northeastern Building Registered*, 399 A.2d at 452.  To be sure, “[o]ne of the most venerable and fundamental tenets of statutory interpretation is that, whenever [a] [c]ourt has interpreted the language of a statute, and the General Assembly subsequently amends or reenacts that statute without changing that language, it must be presumed that the General Assembly intends that [the] [c]ourt’s interpretation become part of the subsequent legislative enactment.” *Verizon Pennsylvania, Inc. v. Commonwealth*, 127 A.3d 745, 757 (Pa. 2015).  Consequently, pursuant to these rules of statutory construction, when our General Assembly recodified the 1945 MAA into the current MAA and failed to insert or delete language in section 5622(a) that could have had an effect on our judicial interpretations of former section 18(A) of the 1945 MAA, our General Assembly signified its intent to readopt our decisional law into section 5622(a) of the MAA.

Even our General Assembly has said as much when it reenacted the MAA. As noted above, section 2 of the 2001 Act provides that “[t]he provisions of [the MAA], so far as they are the same as those of existing laws, are intended as a continuation of such laws and not as new enactments.” *Id.*  Further, section 4 of the 2001 Act states, in part, “that . . . decisions which were made under the [1945 MAA] shall remain in full force and effect until revoked, vacated or modified under [the MAA].” *Id.* Therefore, having established that section 5622(a) continues to vest the City with statutory power to compel the conveyance of the Authority and all of its assets, the issue becomes whether the addition of section 5610(a.1) has superseded that power. We conclude that it has not.

16

To aid our resolution of this issue, we are guided by section 1933 of the Statutory Construction Act of 1972 (SCA),[8] which provides as follows:

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

1 Pa.C.S. §1933.

Upon review, we are unable to perceive a conflict, much less an irreconcilable one, between the two statutory sections at issue, for, based upon their plain language, the two can readily be interpreted in a state of harmony. With regard to section 5622(a) of the MAA, we reaffirm our case law on the former and current versions of the statutory section. As such, our above discussion of these cases demonstrates that, as a matter of law, section 5622(a) confers upon a municipality, via a duly enacted ordinance, the power to dissolve an authority and obtain and later transfer and/or convey the authority's assets as it deems fit, without any input on the part of the authority. Moreover, we note that the title to section 5622(a) is denoted as "[c]onveyance by *authorities* to *municipalities* . . . of established projects," *id.* (emphasis added), thereby marking a line of structural demarcation between a municipality or municipalities and the authority or authorities that it or they have created. *See* section 1924 of the SCA, 1 Pa.C.S. §1924 (stating that the "title . . . of a statute may be considered in the construction thereof"). Notably, the MAA defines a "municipality" as "[a] county, city, town, borough, township or school district of the

---

[8] 1 Pa.C.S. §§1501-1991.

17

Commonwealth." Section 5602 of the MAA, 53 Pa.C.S. §5602 (Definitions). By contrast, the MAA states that a municipality can establish and/or incorporate an "authority," *see* 53 Pa.C.S. §5603, and an "authority" is specified as "[a] body politic and corporate created under this chapter; under the former [1935 MAA]; or under the [1945 MAA]." 53 Pa.C.S. §5602 (Definitions).

By way of comparison, section 5610 is (and has always been) entitled, "[g]overning body." Like the version in the 1945 MAA, subsection (a) states and describes, as a general theme, the "powers of each "*authority*" and how they "shall be exercised by a *board* composed as follows." 53 Pa.C.S. §5610(a) (emphasis added). The statute then proceeds to detail the number of a board's members, the manner in which the "members of the board" are elected and the terms they serve, and the means by which a vacancy is filled. *Id.* Tellingly, the MAA defines a "*board*" as "[t]he governing body of an *authority*," 53 Pa.C.S. §5602 (emphasis added), and not a "*municipality*." Viewing the statutory provisions in this overriding context, we conclude that when our General Assembly amended section 5610(a) with the insertion of subsection (a.1) in 2012, it was simply devising a particular scheme pertaining to the composition of "the governing body" of a "water or sewer authority incorporated by one municipality," specifically an authority that "provides water or sewer services to residents in at least two counties." 53 Pa.C.S. §5610(a.1). In point of fact, akin to subsection (a), subsection (a.1) goes on to delineate the number of "members" and where (or in which municipality or county) they "must reside," and, also, the appointment process and terms of the new "governing body" or "board" of the authority. 53 Pa.C.S. §5610(a.1)(1)-(2).[9]

---

[9] We further note, as an aside, that the provisions within section 5607 of the MAA specifically carve out the "purposes and powers" of "every authority incorporated" by a municipality, including, **(Footnote continued on next page…)**

18

That said, it is clear to us that our General Assembly, in enacting subsection (a.1), merely intended to reconfigure the numerical and geographical organization of a "governing body" or "board" of a water authority that services more than one county. In so doing, the General Assembly distributed and balanced the representation of board members more fairly and equally among a single municipality and other counties in the unique situation where one municipality creates and/or incorporates an authority and that authority provides services to citizens in counties in which the authority was not created and/or incorporated. However, and imperatively, our General Assembly did not include any apparent language in subsection (a.1) that could reasonably reflect an intent to displace or otherwise interfere with our settled case law and the construction we have afforded to the former version of—and even the current version of what is now—section 5622(a) of the MAA. "When confronted with questions of statutory construction, the words of a statute are to be interpreted in light of antecedent case law, and the legislative intent to effectuate a drastic change in the law is not to be inferred by mere omission and implication." *Fonner*, 724 A.2d at 906. Ultimately, section 5622(a) can be read in tandem with section 5610(a.1) of the MAA in a cohesive and consistent manner. While the former dictates the power of a municipality to demand and obtain the conveyance of an authority and the assets it possesses, the latter creates the authority's governing body or board, which, per section

---

*inter alia*, the "powers necessary or convenient for carrying out" the "acquiring," "maintaining," and "operating" of "[w]aterworks, water supply works," and "water distribution systems" projects. 53 Pa.C.S. §5607(a)(10), (d). As part of its operational power, the governing body of an authority may "acquire, purchase, hold, lease as lessee and use any franchise, property, real, personal or mixed, tangible or intangible, or any interest therein necessary or desirable for carrying out the purposes of the authority, and to sell, lease as lessor, transfer and dispose of any property or interest therein at any time acquired by it." 53 Pa.C.S. §5607(d)(4).

5607 of the MAA, manages and controls the daily and operational affairs of the authority. *See supra* note 9.[10]

_____

[10] In response to the Dissent, per section 5610(a) of the MAA, an authority has always possessed the statutory power, through its governing body or board, to manage and control the daily and operational affairs of the authority. *See* 53 Pa.C.S. §5610(a)(1); section 7A(a) of the 1945 MAA, *formerly* 53 P.S. §309A(a); *see also Commonwealth ex rel. Waltman v. Graczyk*, 460 A.2d 1098, 1099 n.1 (Pa. 1983); *City Council of the City of Hazleton v. City of Hazleton*, 578 A.2d 580, 582 (Pa. Cmwlth. 1990). Even so, this Court has consistently held that section 5622(a) of the MAA and its prior versions vest a municipality with the unilateral power to obtain the assets of an authority it has created and incorporated. *See Salem Township Municipal Authority*, 820 A.2d at 890 n.1; *Township of Forks*, 759 A.2d at 54; *Forward Township Sanitary Sewage Authority*, 654 A.2d at 174-75; *Clearfield Borough*, 285 A.2d at 534-35. The Dissent acknowledges, and does not dispute, the "continuity in our case" and concedes that the City, alone, created and incorporated the Authority. *In Re: Chester Water Authority*, __ A.3d __, __ (Pa. Cmwlth., Nos. 489, 504, 514, and 685 C.D. 2020, filed September 16, 2021) (Wojcik, J., dissenting), slip op. at 2. The Dissent also admits that no other municipality has "later joined in the original incorporation" and, thus, the City remains the sole creator and incorporator of the Authority. *Id.* at __, slip op. at 6. Yet, the Dissent would essentially overrule 30-plus years of case law construing section 5622(a), simply because section 5610(a.1) of the MAA expanded the number of members of the governing body or board of an authority when that authority services residents in more than one county. In so proposing, the Dissent fails to appreciate the fundamental scheme and hierarchy of our government—*i.e.*, that the City, as the "maker" of the Authority, is theoretically the ultimate owner of the Authority. In other words, the Dissent's position is grounded on the unstated premise that a municipality can create an autonomous political subdivision that possesses more power than the municipality itself. Although the Authority provides water services into areas outside the boundaries of the City, in no way does this fact alter or otherwise negate the fact that the City presumptively "owns" the Authority for purposes of section 5622(a). In enacting section 5610(a.1), our General Assembly simply provided the other counties with "seats at the table" of the governing body or board of the Authority. If the General Assembly wanted to convert the Authority into a sovereign, multi-county, quasi-municipality, surely it would have expressed its intention to do so in clear and unmistakable language.

In rebuttal, the Dissent insists that "the General Assembly has given the City and Counties, not the Authority itself, equal power in determining what happens to the project **as if they were part of a joint authority**." *Id.* at __, slip op. at 9 (emphasis added). However, the Dissent is effectively rewriting the MAA and judicially creating a *de facto* joint authority out of thin air. Significantly, the Dissent cites and discusses the relevant statutory provisions of the MAA and the procedures to be followed when two or more municipalities combine and create and incorporate a joint authority, and when a non-incorporating municipality subsequently joins with an incorporating municipality to form a joint authority. But, tellingly, the Dissent candidly admits that no such joint authority was created in this case. In short, although Chester County and Delaware County now have representatives on

**(Footnote continued on next page…)**

20

In sum, at best, section 5610(a.1) is silent with respect to, and does not directly touch upon, the subject matter of section 5622(a), which covers the conveyance of property from an *authority* to a *municipality* when the municipality enacts an ordinance demanding the conveyance. Absent a clear expression of legislative intent, through the use of overt wordage, this Court will not infer that the lawmaking body intended to effectively repeal one section of a statute through the enactment of another section in the same statute; instead, a plain reading of section 5622(a) and section 5610(a.1) leads us to conclude, without hesitation, that the two statutory sections are easily reconcilable. *See Duda v. State Board of Pharmacy*, 393 A.2d 57, 59 (Pa. Cmwlth. 1978) ("Repeal by implication arises only where language used in the later statute is irreconcilably repugnant to the provisions of the earlier statute so as absolutely to preclude a consonant construction of both."); *see also Borough of Collegeville v. Philadelphia Suburban 996 Water Company*, 105 A.2d 722, 730 (Pa.

the board or body of the Authority by virtue of section 5610(a.1) of the MAA, Chester County and Delaware County are not incorporating municipalities of the Authority and, thus, cannot be deemed to be a "municipality" that possesses the power to obtain the assets of an authority under section 5622(a) of the MAA.

Finally, the Dissent's reliance on *City of Philadelphia v. Schweiker*, 858 A.2d 75 (Pa. 2004), is severely misplaced. In that case, the General Assembly enacted a statute that granted the City of Philadelphia (city) the authority to create and control a parking authority, including through the appointment of members to serve on the authority, and the power to collect and distribute the revenue collected from the authority. However, the General Assembly explicitly declared that the parking authority was an instrumentality of the Commonwealth—not the city—and subsequently passed legislation that unquestionably transferred control of the parking authority and appointment powers of its members to the Governor of Pennsylvania and, further, clearly dictated how the city must allocate revenue generated by the authority. The only issue on appeal in *Schweiker* that is tangentially relevant here was whether the General Assembly possessed the legislative authority to take away that which it had given to the city, a political subdivision of the Commonwealth. Of course, it does. Here, by contrast, the issue is whether the General Assembly actually exercised such authority when it enacted section 5610(a.1) of the MAA. Respectfully, the Dissent does not substantiate its position with any sound textual statutory analysis or explanation how or why the General Assembly abrogated another statutory section that it enacted, *i.e.*, section 5622(a), and the longstanding case law from this Court interpreting that section.

21

1954) ("Statutes should be construed in harmony with the existing law; repeal by implication is carefully avoided by the courts."). Therefore, contrary to the conclusion reached by the trial court, we conclude that section 5610(a.1) did not disrupt the continuity of our case law. Instead, we hold that section 5622(a) of the MAA continues to vest a municipality, such as the City in this case, with the power to acquire and dispose of the assets of an authority and an authority itself, such as the Authority in this case, without the advice or consent of the authority or, here, the Authority.

Neither the trial court, nor the Authority, nor the County of Chester, as appellees, have submitted any persuasive argument that could sustain an opposite conclusion. Indeed, the trial court's opinion does not contain any foundational premises or deductive reasoning that accounts for why or how it arrived at its interpretation of section 5610(a.1). For their part, the Authority and the County of Chester cite *County of Allegheny v. Moon Township Municipal Authority*, 671 A.2d 662 (Pa. 1996), and *Burke v. North Huntingdon Township Municipal Authority*, 136 A.2d 310 (Pa. 1957), as standing for the proposition that former section 18(A) of the 1945 MAA and, by extension, section 5622(a) of the current MAA, provide the Authority with the authority to transfer the Authority's property on its own accord.

However, in *Clearfield Borough*, this Court already dismissed the contention that *Burke* provided pinpoint authority on the issue, stating that, upon "[a] careful reading," *Burke* did not "clearly rule[] on the specific issue[]" of whether [former] section 18(A) conferred upon an authority the sole power to dispose of its assets and, thus, did not "control[] our ruling in [that] case." *Clearfield Borough*, 285 A.2d at 534. We agree with our observation in *Clearfield Borough* and reaffirm it. In *Burke*, an engineer contracted with a water authority to perform engineering services in connection with a project and, having not been paid for his services, filed a contract

action against the township. Meanwhile, via a written agreement signed by both the township and the water authority, the water works of the water authority were sold to a county authority. On these facts, our Supreme Court concluded that the engineer's contract claim against the township was not cognizable because the township never obtained the "project" and "debts" of its water authority under former section 18(A) of the 1945 MAA. More specifically, the Court held: "[t]he [t]ownship's execution of the agreement between the [water] [a]uthority and the [c]ounty [a]uthority *was simply a waiver by the municipality of its rights to acquire the project from the [water] [a]uthority* and there was no statutory assumption by the municipality of any of the obligations incurred by the [water] [a]uthority in respect to its project." *Burke*, 136 A.2d at 314 (emphasis added).

With this holding in *Burke*, our Supreme Court explicitly recognized that a township possesses the authority to acquire an authority's assets pursuant to former section 18(A) of the 1945 MAA. Consequently, any statements in *Burke* suggesting that an authority can dispose of its own assets by enacting a resolution or ordinance, via former section 18(A) of the 1945 MAA, not only contradicted or undermined its core holding, but also constituted *dicta*, because such statements were not essential to the ruling of that case. *See Valley Township v. City of Coatesville*, 894 A.2d 885, 889 (Pa. Cmwlth. 2006) (stating that *dicta* is "an opinion by a court on a question that is directly involved, briefed, and argued by counsel, and even passed on by the court, but that is not essential to the decision. *Dicta* has no precedential value."). In any event, the water authority in *Burke* did not pass a resolution or ordinance transferring its assets and, as such, the question of whether an authority could have done so under former section 18(A) of the 1945 MAA was not at issue in *Burke*. Therefore, unlike our case law described and discussed above, *Burke* cannot be deemed to have squarely decided

23

the question of whether an authority, in the face of a legislative demand by a municipality for the authority to convey its assets to the municipality, can disregard the municipality's demand and solely transfer and/or sell its assets per the power exclusively granted to it under former section 18(A) of the 1945 MAA.

Similarly, *County of Allegheny* did not decide the issue presently before this Court. In that case, a township authority entered into a contract to convey its pollution control system to a county and the issue was whether the authority had the power to convey its property to another governmental entity under the 1945 MAA. Our Supreme Court concluded that the plain language of former section 4B(d) of the 1945 MAA, which stated that an authority is "empowered . . . to sell, lease as lessor, transfer and dispose of any property or interest therein at any time acquired by it," *formerly* 53 P.S. §306B(d), permitted the authority to do so. Former section 4B(d) of the 1945 MAA is now located in current section 5607(d)(4) and, as mentioned above, likewise provides an authority with the power "to sell, lease as lessor, transfer and dispose of any property or interest therein at any time acquired by it." 53 Pa.C.S. §5607(d)(4). *See supra* note 9. Nonetheless, just because an authority may transfer its assets to other governmental entities, as part of its daily operational affairs under other sections of the 1945 MAA and the current MAA, this does not mean that an authority possesses the same and sole power under section 5622(a) of the MAA. Indeed, as a juxtaposition, the Supreme Court in *County of Allegheny* clarified that, in contrast to former section 4B(d) of the 1945 MAA, former section 18(A) of the 1945 MAA was "*applicable only to instances in which an authority's project is being transferred to the municipality or municipalities that actually created the authority*." *County of Allegheny*, 671 A.2d at 665 (emphasis added). The Supreme Court further added that former section 18(A) was "*presumably enacted to preclude a municipality . . . from assuming responsibility*

24

*over projects absent a resolution or ordinance indicating the municipality's clear willingness to do so*." *Id.* (emphasis added). Therefore, while *County of Allegheny* confirmed that an authority may transfer or convey its assets to another governmental entity in the daily course of its business, it also reaffirmed that, assuming an authority does not want to transfer its assets to another authority or governmental entity, the creating and/or incorporating municipality, proceeding under former section 18(A) of the MAA or section 5622(a) of the MAA, can obtain the authority and its assets by passing an ordinance stating the municipality's desire to do so.

At bottom, both *Burke* and *County of Allegheny* involved issues arising out of the situation where an authority transferred assets to another governmental entity. However, neither *Burke* nor *County of Allegheny* concerned the issue of whether a township or other municipality, pursuant to former section 18(A) of the 1945 MAA or section 5622(a) of the MAA, can obtain an authority and all of its assets, especially where, as here, the municipality created and/or incorporated the authority, and the authority does not wish to relinquish title or control over its assets or projects. Ultimately, the difference in the factual backgrounds presented in *Burke* and *County of Allegheny* from that of this case is extremely significant, rendering *Burke* and *County of Allegheny* inapposite legal authority. Due to the factual disparity between *Burke* and *County of Allegheny* and this case, we conclude that, on consideration, our decisions in *Clearfield Borough*, *Forward Township Sanitary Sewage Authority*, *Township of Forks*, and *Salem Township Municipal Authority* are on all fours with the factual posture of the legal issue before this Court and, thus, constitute controlling and authoritative case law in the interpretation of former section 18(A) of the 1945 MAA and current section 5622(a) of the MAA. For this reason, and those stated above, we

believe that the reliance placed on *Burke* and *County of Allegheny* by the Authority and the County of Chester is misplaced and unwarranted.

The Authority and the County of Chester also make an array of arguments that fall outside the scope of the issue that this Court has accepted for review. For example, the Authority asserts, *inter alia*, that the City cannot satisfy "mandatory preconditions" to exercising its power under section 5622(a), namely that the "project" be one that was "established under [the MAA] by a board appointed by a municipality" and is "of a character which the municipality has the power to establish, maintain[,] or operate." (County of Chester's Br. at 18 (quoting 53 Pa.C.S. §5622(a)).) The Authority further contends that the City never "contributed to the cost of the improvement" and, thus, cannot wield its authority pursuant to section 5622(a). *Id.* at 26 (citing *Gemmill v. Calder*, 3 A.2d 7 (Pa. 1938)). The Authority also states that "the City does not own and has never possessed the Authority," *id.* at 27, and claims that the City's dire financial status does not provide it with a right to obtain the Authority and its assets. On the other hand, the County of Chester argues that, regardless of section 5622(a) of the MAA, section 5607(d)(4) of the MAA provides the Authority with the express authority to place its assets into a trust.

We decline, however, to address any of these legal arguments. When this Court granted the petitions for permission to appeal filed by the City and Aqua, **we accepted one issue, and only one issue, for review: whether section 5610(a.1) of the MAA mandates that the City, the County of Chester, and the County of Delaware, as the "governing body" of the Authority, approve a transfer of the Authority's assets to the City, or whether the City, pursuant to section 5622(a) of the MAA, can obtain the Authority and its assets without the approval of the Authority or its "governing body."** In resolving these appeals, we merely conclude

26

that, despite section 5610(a.1) of the MAA, the City possesses the sole power under section 5622(a) of the MAA to demand and compel the conveyance of the Authority and its assets by enacting the appropriate resolution and/or ordinance. Contrary to what the Dissent says, our decision is limited to determining whether the City possesses the general authority under section 5622(a) to obtain the assets of the Authority. We never decide, and do not reach, the separate issue of whether the City can satisfy all of the conditions within section 5622(a) and obtain *all* of the assets of the Authority. Moreover, this Court voices no opinion as to what particular assets the City may or may not obtain, much less resolve the contractual conditions, *i.e.*, the debt and/or financing obligations, that the City must assume before it could even take possession of those assets. *See* 53 Pa.C.S. §5622(a) (stating that a municipality can only obtain the assets of an authority's specific project "upon the assumption by the municipality of all the obligations incurred by the authorit[y] with respect to that project").[11] These are issues to be resolved on remand and require further factual development.

Further, the Dissent places much emphasize on the receivership proceedings and the 2021 Revised Recovery Plan as discussed in *Davin II*, which simply reflects that the City, as an economically distressed municipality experiencing a fiscal emergency under Act 47, desires to sell the Authority's assets if it can obtain them. *See generally supra* note 6. Apparently, the Dissent does so in an attempt to make an equitable plea for what it believes is just and fair. However, in no way does the 2021 Revised Recovery Plan, as confirmed by this Court in *Davin II*, have any

---

[11] Despite the Dissent's assertion that this is all a "foregone conclusion," __ A.3d at __, slip op. at 10 (Wojcik, J., dissenting), there is naturally a dramatic difference in rendering a legal conclusion that the City, in general, *possesses* the statutory power to obtain the Authority and/or its assets, as opposed to making a conclusion regarding the manner or extent to which the City may lawfully *exercise* that power (by way of analogy, the government obviously has the power to conduct searches and seizures; the precise and particular way that it may do so is another story). While this Court decides the former, it does not the latter.

27

bearing or relevance to this case. Indeed, in that plan, the Receiver explained that "the City is currently before the Commonwealth Court defending its ability to repossess and sell the assets of the [Authority]" and "*direct*[*ed*] *the City to continue litigating for its ability to repossess and sell the assets of the* [Authority]." *Davin II*, slip op. at 7 and Order; 2021 Revised Recovery Plan at 85, 87 (emphasis added). As explained above, the litigation in this case is far from over, and, until all the pertinent legal issues surrounding the City's authority under section 5622(a)—and possibly other statutes— are resolved, the City's plans and future expectations with respect to the Authority's assets are nothing more than a surmised contingency.

Having decided the only issue that we have taken up for review, we remand the cases to the trial court without prejudice to the Authority and the County of Chester to raise the arguments that we have declined to address. We express no view as to what effect, if any, our resolution of the legal issue we accepted for review will have on the trial court's reconsideration of the parties' motions for judgment on the pleadings.

As a final housekeeping matter, we dispose of two supplemental filings of the parties. First, on November 19, 2020, the City filed a letter, titled a "Status Report Update," that responded to an inquiry in this Court's *per curiam* order and provided information relative to the impact, if any, that the City's receivership would have on a sale of the Authority's assets. The Authority has opposed this submission and essentially seeks to strike it because the City did not obtain leave of court and the report should not be considered because the underlying proceedings involved judgment on the pleadings. The Court grants the City's implicit request to take cognizance of its submission and accepts the Status Report Update. However, we note that it did not play a role in our decision. Second, on November 19, 2020, the City filed an

28

application under Pa.R.A.P. 2501(a), requesting that this Court take notice of the Supreme Court's recent decision in *In re Canvassing Observation*, 241 A.3d 339 (Pa 2020). The Court grants the City's application and accepts *In re Canvassing Observation* as potential legal authority in these matters, but, having considered that case, we conclude that it is inapplicable.

Accordingly, and for the above-stated reasons, we reverse the trial court's April 24, 2020 orders denying the motion for judgment on the pleadings filed by the City and Aqua and remand the cases to the trial court for further proceedings consistent with this opinion. We grant the City's request to accept its Status Report Update and, also, its application filed under Pa.R.A.P. 2501(a).

_____
PATRICIA A. McCULLOUGH, Judge

Judges Fizzano Cannon and Crompton did not participate in this decision.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Chester Water Authority Trust | : | |
| | : | |
| | : | No. 489 C.D. 2020 |
| Appeal of: City of Chester | : | |
| | | |
| In Re: Petition for Approval of Declaration of Trust Under Pennsylvania Law and the Transfer of Legal Title to Certain Assets to the Trust | : : : : : : | No. 504 C.D. 2020 |
| | : | |
| Appeal of: Aqua Pennsylvania, Inc. | : | |
| | : | |
| | | |
| City of Chester, Appellant | : : : | No. 514 C.D. 2020 |
| v. | : : | |
| Chester Water Authority | : | |
| | | |
| In Re: Petition for Approval of Declaration of Trust Under Pennsylvania Law and the Transfer of Legal Title to Certain Assets to the Trust | : : : : : | No. 685 C.D. 2020 |
| | : | |
| Appeal of: Aqua Pennsylvania, Inc. | : | |

## ***ORDER***

AND NOW, this 16th day of September, 2021, the April 24, 2020 orders of the Court of Common Pleas of Delaware County (trial court) are hereby REVERSED, and the cases are REMANDED to the trial court for further proceedings consistent with this opinion. The November 19, 2020 "Status Report

Update," filed by the City of Chester (City), is treated as an application to accept the submission for consideration in this case, and such application is GRANTED. The City's application filed on November 19, 2020, and pursuant to Pa.R.A.P. 2501(a) is also GRANTED.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Chester Water Authority Trust

Appeal of: City of Chester

: No. 489 C.D. 2020
:
:
:

In Re: Petition for Approval of
Declaration of Trust Under
Pennsylvania Law and the Transfer
of Legal Title to Certain Assets to the
Trust

Appeal of: Aqua Pennsylvania, Inc.

: No. 504 C.D. 2020
:
:
:
:
:
:
:

City of Chester,

                              Appellant

              v.

Chester Water Authority

:
:
:
:
:
:
: No. 514 C.D. 2020
:
:
:

In Re: Petition for Approval of
Declaration of Trust Under
Pennsylvania Law and the Transfer
of Legal Title to Certain Assets to the
Trust

Appeal of: Aqua Pennsylvania, Inc.

: No. 685 C.D. 2020
: Argued: November 10, 2020
:
:
:

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge


DISSENTING OPINION
BY JUDGE WOJCIK                          FILED: September 16, 2021

I respectfully dissent. Although I agree with the Majority's recitation of the tenets of statutory construction and the continuity of our case law, I do not agree with the interpretation of the statutory provisions at issue. The Majority's mischaracterization of the Dissent's position demonstrates the error in its analysis.

Section 5610(a.1) of the Municipality Authorities Act (MAA) provides:

> Water authorities and sewer authorities.--If a water or sewer authority incorporated by one municipality provides water or sewer services to residents in at least two counties and has water or sewer projects in more than two counties where the combined population of the served municipalities, excluding the incorporating municipality, is at least five times the population of the incorporating municipality, all of the following apply:
>
> > (1) Ninety days after the effective date of this subsection, the governing body in existence on the effective date of this subsection shall be replaced by a governing body comprised of the following:
> >
> > > (i) Three members appointed by the governing body from each county in which the services to residents are provided. A member under this subparagraph must reside in a town, township or borough, which receives services from the authority.
> > >
> > > (ii) Three members appointed by the governing body of the incorporating municipality.

53 Pa. C.S. §5610(a.1).

Section 5622(a) of the MAA provides:

> If a project established under this chapter *by a board appointed by a municipality* is of a character which the municipality has power to establish, maintain or operate and *the municipality desires to acquire the project, it may by appropriate resolution or ordinance adopted by the proper authorities signify its desire to do so*, and the

> authorities shall convey by appropriate instrument the project to the municipality ***upon the assumption by the municipality*** of all the obligations incurred by the authorities with respect to that project.

53 Pa. C.S. §5622(a) (emphasis added). Generally, the term "project" refers to the kind and character of projects permitted including "[w]aterworks, water supply works, water distribution systems." Section 5607(a)(10) of the MAA, 53 Pa. C.S. §5607(a)(10). As used within Section 5610 of the MAA, "[w]ater or sewer project" specifically refers to "[a]ny pumping station, filtering plant, impoundment facility, dam, spillway or reservoir." 53 Pa. C.S. §5610(g). The term "[b]oard" refers to the "governing body of an authority." Section 5602 of the MAA, 53 Pa. C.S. §5602. For purposes of Section 5610 of the MAA, a "[w]ater or sewer authority" is "[a]n authority incorporated by a city of the third class, a borough, a town or a township to provide water or sewer services." 53 Pa. C.S. §5610(g).

What we are dealing with here is a water project established under the MAA by the Chester Water Authority (Authority). The Authority was incorporated by the City of Chester (City), a city of the third class, in 1939. Reproduced Record (R.R.) at 1551a-53a. At inception, the Authority provided water services almost exclusively to the residents of the City, with systems and infrastructure located within the City. R.R. at 25a. With post-war suburban growth, the service area expanded into Chester County and Delaware County (Counties). *Id.* To accommodate the growing service area's needs, the Authority acquired existing systems and constructed significant infrastructure outside of the City in the Counties. *Id.* These improvements included "a small pumping station and the pertinent water rights, in Pine Grove, on the Octoraro Creek, Chester County . . . forty miles distant from the City"; and "a dam, spill way, and a two[-]billion[-]gallon reservoir on the

Octoraro Creek, a filtering plant and pumping station at Pine Grove and a large transmission main to carry the water to Chester." *Rankin v. Chester Municipal Authority*, 68 A.2d 458, 462 (Pa. Super. 1949). The acquisition and construction of property and infrastructure was financed by the Authority through the issuance of water revenue bonds and water rates paid by the Authority's ratepayers, not by City funding. *Id.* Today, the Authority serves approximately 200,000 ratepayers across 37 municipalities throughout Chester and Delaware Counties and beyond. Only 21% of its ratepayers are located within the City itself. R.R. at 25a.

For years, the City, as the incorporating municipality, solely appointed the Authority's governing body. However, that changed when the General Assembly added Section 5610(a.1) of the MAA – a special provision that appears to be applicable only to the Authority at the present time. Because the Authority "provides water or sewer services to residents *in at least two counties* and has water or sewer projects in more than two counties *where the combined population of the served municipalities*, excluding the incorporating municipality, *is at least five times the population of the incorporating municipality*," the General Assembly altered the composition of the Authority's governing body to give equal representation to the municipalities serviced by the Authority. 53 Pa. C.S. §5610(a.1) (emphasis added). As a result, the Authority went from a five-member governing body appointed solely by the City to a nine-member governing body appointed equally by the City, Chester County, and Delaware County.

This alteration is significant. When Section 5622(a) and Section 5610(a.1) are read together, as they must be, and applied to the situation here, the Authority's board is no longer "a board appointed by a municipality" for purposes of Section 5622(a) of the MAA. *See Pennsylvania Gaming Control Board v. Office*

*of Open Records*, 103 A.3d 1276, 1285 (Pa. 2014) (holding "statutory language must be read in context, that is, in ascertaining legislative intent, every portion of statutory language is to be read together and in conjunction with the remaining statutory language, and construed with reference to the entire statute as a whole"). Rather, it is a board appointed by three municipalities. Consequently, under Section 5622(a), "the proper authorities" to adopt a resolution or ordinance to convey the project are the City, Chester County, and Delaware County. By altering the membership of the Authority's board, the General Assembly has impaired the City's ability to unilaterally make decisions for the Authority and acquire the project without the approval of the other two municipalities represented by the Authority.

The situation is akin to that of a joint authority. "Whenever the municipal authorities of any municipality singly or of two or more municipalities jointly desire to organize an authority under this chapter, they shall adopt a resolution or ordinance signifying their intention to do so." Section 5603(a) of the MAA, 53 Pa. C.S. §5603(a). In addition, Section 5604(b) of the MAA, 53 Pa. C.S. §5604(b), empowers non-incorporating municipalities to join in the original incorporation. "When an authority has been incorporated by one or more municipalities, a municipality not having joined in the original incorporation may subsequently join in the authority." Section 5604(b) of the MAA, 53 Pa. C.S. §5604(b). A municipality wishing to become a member of an existing authority must signify its desire by resolution or ordinance, filing an application, and certification. Section 5604(c)-(e) of the MAA, 53 Pa. C.S. §5604(c)-(e). "If the authority is incorporated by two or more municipalities, the board shall consist of a number of members at least *equal to the number of municipalities incorporating the authority*, but in no event less than five." Section 5610(a)(2) of the MAA, 53

MHW-5

Pa. C.S. §5610(a)(2) (emphasis added). In addition, "[w]hen one or more additional municipalities join an existing authority, *each of the joining municipalities shall have similar membership on the board* as the municipalities then members of the authority and the joining municipalities may determine by appropriate resolutions." *Id.* (emphasis added). If an authority was incorporated by two or more municipalities at its inception, or later joined by a municipality not having joined in the original incorporation, a minority municipality would not have the power to unilaterally acquire the project. *See* Section 5622(a) of the MAA, 53 Pa. C.S. §5622(a).

The same logic applies here. Although neither Chester County nor Delaware County incorporated the Authority or later joined in the original incorporation, Section 5610(a.1) of the MAA has elevated the Counties to "joining municipalities" for all practical intents and purposes. The General Assembly "replaced" the existing board appointed by the City with a *new* board appointed by the City and both Counties. 53 Pa. C.S. §5610(a.1). By assigning the Counties "membership on the board" *equal* to the City's membership, the General Assembly did by legislative fiat what the municipalities could have done themselves by jointly incorporating at the Authority's inception or later adopting a resolution or ordinance signifying their intention to jointly organize. *See* Section 5603(a) of the MAA, 53 Pa. C.S. §5603(a); Section 5610(a)(2) of the MAA, 53 Pa. C.S. §5610(a)(2); *see also City of Philadelphia v. Schweiker*, 858 A.2d 75 (Pa. 2004).

This is not the first time that the General Assembly has transferred control of an authority by legislation by altering the composition of the governing body. In *Schweiker*, the General Assembly took similar action by taking over control of the Philadelphia Parking Authority (Parking Authority). The Parking Authority was created by ordinance by the City of Philadelphia in 1950. Under former Section

8 of the Parking Authority Law,[1] the Parking Authority was controlled by a five-member governing board appointed by the Mayor of Philadelphia (Mayor).  Pursuant to this control, the Parking Authority paid the City of Philadelphia revenues derived from parking facilities and on-street parking services, which amounted to approximately $34,500,000 per year.  These monies formed part of the City of Philadelphia's annual operating budget.  *Schweiker*, 858 A.2d at 79.

In 2001, the General Assembly enacted Act 22 of 2001 (Act 22),[2] which codified and "amended the Parking Authority Law by adding a special provision – applicable only to Philadelphia – supplanting the Mayor's appointment powers over the Parking Authority's governing board and repositing appointment authority in the Governor."  *Schweiker*, 858 A.2d at 80.  Act 22 also ordered the transfer of up to $45,000,000 of its retained earnings to the Philadelphia School District.  *Id.*  Even though the Parking Authority was established by the City of Philadelphia, the General Assembly legally *transferred control* of the Parking Authority from the City of Philadelphia to the Commonwealth.  *Id.*

Similarly, here, by enacting Section 5610(a.1), the General Assembly has transferred some of the City's control over the Authority and the project by taking away the City's exclusive appointment power and repositing that power in the City, Chester County and Delaware County in equal measure.[3]

---

[1] Act of June 5, 1947, P.L. 458, *as amended*, *formerly* 53 P.S. §348, repealed by the Act of June 19, 2001, P.L. 287.  *See new* 53 Pa. C.S. §5508.

[2] Act of June 19, 2001, P.L. 287, No. 22.

[3] The Majority's attack on our citation to *Schweiker* again demonstrates its inability to comprehend the import of the General Assembly's enactment of Section 5610(a.1).  It is beyond question that Act 22 and Section 5610(a.1) were enacted to apply to distinct entities serving differing purposes.  Our citation to *Schweiker* is merely to demonstrate, as the Majority readily **(Footnote continued on next page…)**

MHW-7

Contrary to the Majority's supposition, this interpretation does not suggest that "a municipality can create an autonomous political subdivision that possesses more power than the municipality itself," "overrule 30-plus years of case law construing [S]ection 5622(a)," or "effectively rewrit[e] the MAA." *In Re Chester Water Authority*, __ A.3d __, __ (Pa. Cmwlth., Nos. 489, 504, 514, and 685 C.D. 2020, filed September 16, 2021), slip op. at 20 n.10. Nor does this interpretation render an inharmonious result within the statute itself or interfere with our longstanding precedent that a single municipality that exclusively appoints an authority's board has the power to unilaterally direct the transfer of authority property. *See Township of Forks v. Forks Township Municipal Sewer Authority*, 759 A.2d 47 (Pa. Cmwlth. 2000); *Forward Township Sanitary Sewage Authority v. Township of Forward*, 654 A.2d 170 (Pa. Cmwlth. 1995); *Clearfield Borough v. Clearfield Borough Park Authority*, 285 A.2d 532 (Pa. Cmwlth. 1971), *aff'd*, 301 A.2d 372 (Pa. 1973) (per curiam). Rather, this interpretation simply gives meaning

---

concedes, that the General Assembly had the authority, and chose to exercise it via Section 5610(a.1)'s enactment, to wrest away complete control from the City over the Authority. Moreover, and contrary to the Majority's hyperbolic assertion, Section 5610(a.1) did not abrogate Section 5622(a) or longstanding case law interpreting the same. Rather, as outlined extensively throughout our Dissent, Section 5610(a.1) merely altered the City's ability to meet the statutory criteria to unilaterally acquire the project under Section 5622(a) by changing the composition of the board and granting the Counties equal membership on the board with equal authority to control the Authority and its assets. By way of hypothetical, suppose that the General Assembly amended the definition of "municipality" under Section 5602 of the MAA, 53 Pa. C.S. §5602, which is defined as "[a] county, city, town, borough, township or school district of the Commonwealth," by excluding "cities" from the definition. Such an amendment would similarly impede the City's ability to acquire the project under Section 5622(a) because it would no longer meet the statutory criteria for doing so. In that situation, it would be completely unnecessary for the General Assembly to amend Section 5622(a) in order to effectuate the desired result because the amendment would be self-operating. The same holds true here. The General Assembly, by changing the composition of the board and granting the Counties equal membership on the board with equal authority to control the Authority under Section 5610(a.1), altered the City's ability to meet the statutory criteria to unilaterally acquire the project under Section 5622(a) of the MAA.

to the General Assembly's amendment by limiting "a municipality's" ability to "acquire a project" when that municipality no longer meets the statutory criteria for doing so. By giving the Counties appointment power and representation on the Authority's board, the General Assembly has given the City and Counties, not the Authority itself, equal power in determining what happens to the project as if they were part of a joint authority.

The Majority opines that "[i]n enacting [S]ection 5610(a.1), our General Assembly simply provided the [Counties] with 'seats at the table' of the governing body or board of the Authority." *In Re Chester Water Authority*, __ A.3d at __, slip op. at 20 n.10. Yet, the Majority ascribes little to no significance to the Counties' representation. As the Majority recognizes: "The cardinal rule of all statutory interpretation is to ascertain and effectuate the intent of the General Assembly." *O'Rourke v. Department of Corrections*, 778 A.2d 1194, 1201 (Pa. 2001). In my view, the General Assembly did not amend the MAA to simply give counties meeting the specific criteria *token* "seats at the table" to ensure uniform rates and service and manage the Authority's day-to-day affairs.[4] Rather, the General Assembly recognized Chester and Delaware Counties as critical stakeholders in this water project and as representatives for their constituent ratepayers who, in this unique situation, outnumber the City's ratepayers by "at least five times." 53 Pa. C.S. §5610(a.1). The growth and success of the water project has been built on the backs of the Counties' ratepayers. Therefore, the General

---

[4] Such a narrow interpretation of Section 5610(a.1) is superfluous to protections found elsewhere in the MAA. Section 5607(d)(9) already requires the authority to fix "reasonable and uniform" rates and to provide "safe and reasonable service . . . *in the areas served*," regardless of board composition. 53 Pa. C.S. §5607(d)(9) (emphasis added). "Any person questioning the reasonableness or uniformity of a rate fixed by an authority or the adequacy, safety and reasonableness of the authority's services, including extensions thereof, may bring suit against the authority . . . ." *Id.*

Assembly gave the Counties "seats at the table" of the governing board to give them some meaningful control over the Authority, its assets, and "the project" that provides them with vital water service in their areas.

The Majority's upside-down logic has the tail wagging the dog. Under the Majority's statutory interpretation, the City would constitute a super-minority of the Authority's board, with the ability to unilaterally "acquire the project" and sell the Authority's assets to pay the City's debt, leaving the 79% majority of the Authority's ratepayers living in the Counties and elsewhere, where the majority of the assets are actually located, holding the bag. The General Assembly could not have intended such an intolerable and absurd result. *See* Section 1922(1) of the Statutory Construction Act of 1972, 1 Pa. C.S. §1922(1) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: . . . That the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable.").

Finally, the resolution of whether the City possesses the general authority under Section 5622(a) of the MAA to acquire the project and obtain the assets of the Authority is the critical inquiry before this Court and the ultimate precondition for the sale of those assets. Once that determination is reached, the City's ability to dissolve the Authority and sell the assets is a foregone conclusion. The adoption of an appropriate resolution or ordinance and assumption of obligations are mere formalities. *See* 53 Pa. C.S. §5622(a). In fact, the City is already in the process of selling off the Authority's assets to remedy its financial distress. The Majority simply chooses to ignore objective reality in this regard.

By a June 8, 2021 Memorandum and Order, this Court confirmed the Revised Recovery Plan (2021 Plan) that was filed in this Court on April 7, 2021, by

the Receiver appointed for the City pursuant to the Municipalities Financial Recovery Act (Act 47).[5, 6]  *See Davin v. City of Chester* (Pa. Cmwlth., No. 336 M.D. 2020, filed June 8, 2021).  In relevant part, the 2021 Plan states:

> The City is currently before the Commonwealth Court defending its ability to repossess and sell the assets of the [Authority], which could provide it with a significant infusion of needed funds.  An en banc panel of the Commonwealth Court heard oral argument on the matter on November 10, 2020.  At the time of the filing of this [2021] Plan, the Commonwealth Court had not issued its opinion.
>
> The City issued a request for proposals (RFP) for the purchase of the Water System and received three proposals from Aqua America, Pennsylvania American Water and the [Authority] itself.  According to the initial bids, the City could potentially receive between $60 million and $410 million if it sells the system.  Pursuant to the pending litigation, although the City was permitted to proceed with the RFP process, the City is currently enjoined from completing any transaction involving the disposition of the system.
>
> The Receiver asked PFM Financial Advisors ("PFM"), a member of the Receiver's team, to conduct its own independent analysis and due diligence of the proposals that the City received to purchase [Authority] assets. PFM compared the purchase prices and the rate/average bill projections of each proposal and provided what it expected to be the [Authority]'s up-front fair market value.  This analysis was provided to the Court in the Receiver's December 2, 2020 update.  Based on commonly utilized valuation methods, PFM expected that [the Authority's]

---

[5] Act of July 10, 1987, P.L. 246, *as amended*, 53 P.S. §§11701.101-11701.712.

[6] It is appropriate for us to take judicial notice of our own official court records.  *See, e.g.*, Pa. R.E. 201(b)(2); *Germantown Cab Company v. Philadelphia Parking Authority*, 27 A.3d 280, 283 n.8 (Pa. Cmwlth. 2011); *Doxsey v. Commonwealth*, 674 A.2d 1173, 1174 (Pa. Cmwlth. 2004).

up-front fair market value to be in the range of $385 million to $400 million

\* \* \*

The Receiver hereby directs the City to continue litigating for its ability to repossess and sell the assets of the [Authority].  Furthermore, subject to the next paragraph, the Receiver authorizes the City to continue with the RFP process (in compliance with any court order).

The City will consult with the Receiver regarding all material steps to be taken by the City with respect to the Water System.  The City must obtain the prior written consent of the Receiver prior to accepting a proposal under the RFP process and/or prior to consummating any transaction regarding the water system.  The City must obtain the prior written consent of the Receiver prior to accepting any proposal related to the resolution of the outstanding litigation regarding the water system.

\* \* \*

The City shall consult with the Receiver regarding all material steps to be taken by the City with respect to any City assets.  The City must obtain the prior written consent of the Receiver prior to spending any revenues generated from the monetization of City assets.  If the City is able to generate revenue from the sale of any City assets, it must first determine what debt obligations must be defeased in accordance with applicable covenants and specifically obligations related to the Series 2017A Bonds.

There are several potential uses for asset monetization proceeds if the City reaches that point in the process.  The City shall use these one-time revenues to fund non-recurring expenditures and address the City's structural problems, and shall not use the proceeds to fund ongoing operating expenditures.  At the direction of the Receiver, the City shall then direct any proceeds, including any advances, generated from any asset monetization to the following immediate priorities . . . .

2021 Plan at 85, 87 (footnotes omitted).

MHW-12

Thus, contrary to the Majority's assertion that the Authority's assets may hypothetically come up for sale by the City based on our holding in this case, the City has already started the RFP process to "monetize" the Authority's assets, and there is already a Court-approved plan in place for the use of the proceeds of the City's sale of those assets. It is patently unconscionable to permit the City to pay off its own municipal debt by selling the Authority's assets that were paid for by its ratepayers, the vast majority of whom reside in the Counties and elsewhere. In fact, the General Assembly granted the Counties "seats at the table" to prevent the City from looting the Authority, and using the sale of the Authority's assets as its own municipal piggy bank, by enacting Section 5610(a.1).

Accordingly, unlike the Majority, I would affirm the trial court's order.

_____
MICHAEL H. WOJCIK, Judge

Judge Cohn Jubelirer joins in this dissent.